**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **PROFESSIONAL DOG BREEDERS ADVISORY COUNCIL, INC; NAT SLADKIN; SUSAN INSERRA; and NATHAN MYER,** | **NO. 09-0258** |
| Plaintiffs | **(Judge Rambo)** |
| | **ELECTRONICALLY FILED** |
| v. | |
| **DENNIS WOLFF, SECRETARY, PENNSYLVANIA DEPARTMENT OF AGRICULTURE, in his individual capacity,** | |
| Defendant | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

**THOMAS W. CORBETT, JR.**
**Attorney General**

By: s/Kenneth L. Joel

**KENNETH L. JOEL**
**Senior Deputy Attorney General**
**Attorney I.D. #72370**

**Office of Attorney General**
**Litigation Section**
**15th Floor, Strawberry Square**
**Harrisburg, PA 17120**
**Phone: 717-705-7327 - Direct**
**Fax:     717-772-4526**
**kjoel@attorneygeneral.gov**
**Date: April 3, 2009**

**SUSAN J. FORNEY**
**Chief Deputy Attorney General**
**Chief, Civil Litigation Section**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PROCEDURAL HISTORY .................................................................................. 1

STATEMENT OF FACTS ................................................................................... 1

STATEMENT OF QUESTIONS .......................................................................... 2

ARGUMENT ........................................................................................................ 3

A.   Summary Judgment Standard ........................................................................ 3

B.   PDBAC Lacks Standing ................................................................................ 5

C.   Section 1983 Maxims .................................................................................... 8

D.   Plaintiffs' Challenges To § 207(h, i) Are Without Merit ............................... 8

    1.   Section 207 Requirements That Apply To All Kennels .................... 12

    2.   Commercial Kennels Are Not Similarly Situated For Equal
       Protection Purposes ........................................................................ 12

    3.   A Rational Basis Exists For § 207(h, i) ........................................... 16

E.   Plaintiffs' Challenge To § 211(c) Is Without Merit ..................................... 18

    1.   Statutory Framework -- § 211 ......................................................... 18

    2.   Plaintiffs' Takings Claim Is Without Merit ..................................... 22

    3.   § 211(c) Does Not Violate The Due Process Clause ....................... 25

       a.   Statutory Framework -- Redux ............................................. 26

       b.   Plaintiffs' Due Process Claim Is Not Ripe ........................... 29

       c.   Plaintiffs' Due Process Claim -- Substance .......................... 29

F.      Plaintiffs' Challenge To § 218 And § 901 Must Be Dismissed ...................35

    1.      Statutory Framework -- §§ 218/901 ...................................................36

    2.      Warrantless Search/Inspection Maxims .............................................38

    3.      Application Of Cases To § 218/§ 901 ...............................................41

G.      Plaintiffs Challenge To § 209 Must Be Rejected.........................................45

    1.      Pennsylvania Plaintiffs Lack Standing For Both Claims ..................45

    2.      Commerce Clause...............................................................................46

    3.      Privileges And Immunities.................................................................53

H.      Plaintiffs' Challenge To The Privacy Act Must Be Rejected.......................54

CONCLUSION ........................................................................................................55

CERTIFICATE OF WORD COUNT....................................................................56

CERTIFICATE OF SERVICE...............................................................................57

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A.L. Blades & Sons, Inc. v. Yerusalim*
121 F.3d 865, 870 (3d Cir. 1997) ...............................................................53

*American Canine Foundation v. Sun*
No. 06-4713, 2007 WL 4208358 at * 9-10 (N.D. Cal. 2007)......................49

*American Trucking Associations v. Michigan Public Service Comm.*
545 U.S. 429 (2005).......................................................................46, 47, 53

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)................................................................................. 4

*Atascadero State Hospital v. Scanlon*
473 U.S. 234 (1985)................................................................................. 1

*Brian B. ex rel. Lois B. v. Commonwealth of Pennsylvania, Department of
Education*
230 F.3d 582 (3d Cir. 2000), *cert. denied*, 532 U.S. 972 (2001).................11

*C&A Carbone, Inc. v. Town of Clarkson*
511 U.S. 383 (1994).................................................................................50

*Carole Media LLC v. New Jersey Transit Corp.*
550 F.3d 302 (3d Cir. 2008) ....................................................................24

*CBS Outdoor Inc. v. New Jersey Transit Corporation* C.A. No. 06-2428,
2007 WL 2509633 (D. N.J. 2007)............................................................24

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986)...............................................................................3, 4

*City of Cleburne, Texas v. Cleburne Living Center*
473 U.S. 432 (1985)................................................................................. 9

*Colonnade Catering Corp. v. U.S.*
397 U.S. 72 (1970).........................................................................2, 39, 44

*County Concrete Corp. v. Twp. of Roxbury*
        442 F.3d 159, 164 (3d Cir. 2006) ................................................................23

*County of Sacramento v. Lewis*
        523 U.S. 833 (1998) ...............................................................25, 29, 47

*D'Altilio v. Dover Township* C.A. No. 1:06-CV-1931, 2007 WL 2845073 at
        *4 (M.D. Pa. 2007) ........................................................................25

*Dehart v. Town of Austin*
        39 F.3d 718 (7th Cir. 1994) ...........................................................48

*Department of Environmental Resources v. Blosenski Disposal Service*
        523 Pa. 274, 566 A.2d 845, 850 (1989) ........................................44

*Department of Revenue of Kentucky v. Davis*
        128 S.Ct. 1801 (2008) ....................................................................46

*Dixon v. Love*
        431 U.S. 105 (1977) ................................................................31, 33

*Donovan v. Dewey*
        452 U.S. 594 (1981) ........................................................................38

*Doylestown Elec. Supply Co. v. Maryland Cas. Ins. Co.*
        942 F. Supp. 1018 (E.D. Pa. 1996) .................................................10

*FCC v. Beach Comm's, Inc.*
        508 U.S. 307 (1993) .................................................................9, 11

*First English Evangelical Lutheran Church v. County of Los Angeles*
        482 U.S. 304 (1987) ................................................................23, 25

*Flemming v. Nestor*
        363 U.S. 603 (1960) ........................................................................11

*Frey v. Panza*
        621 F.2d 596 (3d Cir.), *cert. denied*, 449 U.S. 1035 (1980) ...................39, 41

*Gallenthin Realty Development, Inc. v. BP Products of North America*
2005 WL 408041 at *2 (E.D. Pa. 2005), *aff'd*, 163 Fed. Appx. 146 (3d Cir.), *cert. denied*, 127 S.Ct. 57 (2006) ......................................................50

*Graham v. Connor*
490 U.S. 386 (1989)............................................................................ 8

*Hahn v. U.S.*
757 F.2d 581 (3d Cir. 1985)...........................................................9, 11

*Harkey v. deWetter*
443 F.2d 828 (5th Cir.), *cert. denied*, 404 U.S. 828 (1971) .........................42

*Hedberg v. Indiana Bell Tel. Co., Inc.*
47 F.3d 928 (7th Cir. 1995)................................................................ 4

*Heller v. Doe*
509 U.S. 312 (1994)...........................................................................10

*Hodel v. Indiana*
452 U.S. 314 (1981)...........................................................................11

*Hodgins v. U.S. Dept. of Agriculture*
238 F.3d 421 (6th Cir. 2000) ........................................................41

*Hudson v. Palmer*
468 U.S. 517 (1984)...........................................................................30

*Hunt v. Washington Apple Adver. Comm'n*
432 U.S. 333 (1977)........................................................................ 6

*Katzenbach v. Morgan*
384 U.S. 641 (1966)...........................................................................10

*Kerr v. Kimmel*
740 F. Supp. 1525 (D. Kan. 1990) ...........................................................49

*Kline v. First West Government Securities*
24 F.3d 480 (3d Cir. 1994)............................................................. 4

*Knight v. Tape, Inc.*
    935 F.2d 617 (3d Cir. 1991) .......................................................26

*Lehnhausen v. Lake Shore Auto Parts Co.*
    410 U.S. 356 (1973) ................................................................. 9

*Lewis v. BT Inv. Managers*
    447 U.S. 27 (1980) ...................................................................47

*Lewis v. Rendell*
    501 F. Supp. 2d 671 (E.D. Pa. 2007) .........................................29

*Lexington Ins. Co. v. Western Pennsylvania Hosp.*
    423 F.3d 318 (3d Cir. 2005) ...................................................... 4

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005) ......................23, 25

*Lovgren v. Byrne*
    787 F.2d 857 (3d Cir. 1986) .....................................................42

*Lujan v. Defenders of Wildlife*
    504 U.S. 555 (1992) .................................................................45

*Maine v. Taylor*
    477 U.S. 131 (1986) .................................................................47

*Mathews v. Eldridge*
    424 U.S. 319 (1976) .............................................................31, 32

*Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation*
    475 U.S. 574 (1986) ...............................................................4, 5

*Meier v. Anderson*
    692 F. Supp. 546 (E.D. Pa. 1988), *aff'd*, 869 F.2d 590 (3d Cir. 1989).........26

*Michigan Wolfdog Ass'n, Inc. v. St. Clair County*
    122 F. Supp. 2d 794 (E.D. Mich. 2000) ....................................42

*Miller v. Strahl*, 239 U.S. 426 (1915) ..................................................15

*Myrie v. Commissioner, N.J. Department of Corrections*
    267 F.3d 251 (3d Cir. 2001)........................................................26

*New Hanover Township v. Army Corps of Engineers*
    992 F.2d 470 (3d Cir. 1993)..................................................18, 29

*New York v. Burger*
    482 U.S. 691 (1987)..............................................39, 40, 41, 42

*Nicchia v. New York*
    254 U.S. 228 (1920).................................................................48

*Nicholas v. Pa. State Univ.*
    227 F.3d 133 (3d Cir. 2000).....................................................25

*Pennhurst State School and Hospital v. Halderman*
    465 U.S. 89 (1984).................................................................. 1

*Philadelphia Federation of Teachers v. Ridge*
    150 F.3d 319 (3d Cir. 1998)..................................................18, 29

*Pike v. Bruce Church*
    397 U.S. 137 (1970).................................................................47

*Pre-Need Family Services Eastern Region v. Bureau of Professional and*
    *Occupational Affairs*
    904 A.2d 996 (Pa. Cmwlth. 2006)............................................18

*Public Interest Research Group of New Jersey v. Magnesium Elektron, Inc.*
    123 F.3d 111 (3d Cir. 1997).................................................... 6

*Railway Express Agency v. Commonwealth of Virginia*
    282 U.S. 440 (1931).................................................................49

*Rizzo v. Goode*
    423 U.S. 362 (1976)................................................................. 8

*Roschen v. Ward*
    279 U.S. 337 (1929).................................................................10

*Rouse v. Plantier*
        182 F.3d 192 (3d Cir. 1999) ........................................................................ 8

*Sameric Corp. v. City of Philadelphia*
        142 F.3d 582 (3d Cir. 1998) ........................................................................ 8

*Sammon v. New Jersey Board of Medical Examiners*
        66 F.3d 639 (3d Cir. 1995) ........................................................................26

*Scott v. Harris*
        127 S.Ct. 1769 (2007) ............................................................................... 5

*SPGGC, LLC v. Blumenthal*
        505 F.3d 183 (2d Cir. 2007) .....................................................................47

*Tolchin v. Supreme Court of the State of New Jersey*
        111 F.3d 1099 (3d Cir.), *cert. denied*, 522 U.S. 977 (1997) .......................49

*United Artists Theatre Circuit v. Township of Warrington*
        316 F.3d 392 (3d Cir. 2003) .....................................................................26

*United Haulers v. Oneida-Herkimer Solid Waste Man. Auth.*
        127 S.Ct. 1786 (2007) ..............................................................................47

*United States v. Biswell*
        406 U.S. 311 (1972) ..............................................................2, 39, 42, 44

*Warth v. Seldin*
        422 U.S. 490 (1975) ................................................................................46

*White v. Mass. Council of Constr. Employers, Inc.*
        460 U.S. 204 (1983) ................................................................................48

*Will v. Michigan Department of State Police*
        491 U.S. 58 (1989) ................................................................................... 1

*Williamson County Regional Planning Comission v. Hamilton Bank*
        473 U.S. 172, 186 (1985) .........................................................................23

*Williamson v. Lee Optical Co.* 348 U.S. 483 (1955)........................................10, 16

**Statutes**

2 Pa.C.S. §§ 502, 504, 505, 506, 507 ...................................................................30

2 Pa.C.S. §§ 701, 702, 703, 704 ..........................................................................30

3 P.S. § 111.53.......................................................................................................40

3 P.S. § 459-1001(a) .............................................................................................54

3 P.S. § 459-101.....................................................................................................41

3 P.S. § 459-102..............................................................................................13, 14

3 P.S. § 459-207(g).................................................................................................12

3 P.S. § 459-207(h)(7, 8)....................................................................................... 8

3 P.S. § 459-207(h, i) ............................................................................................ 8

3 P.S. § 459-209(a) ...............................................................................................51

3 P.S. § 459-209(a.1) ............................................................................................51

3 P.S. § 459-209(b) ...............................................................................................51

3 P.S. § 459-209(c) ...............................................................................................52

3 P.S. § 459-211(a) .....................................................................................19, 26, 34

3 P.S. § 459-211(a)(1-11) ......................................................................................19

3 P.S. § 459-211(a.1) ........................................................................................19, 34

3 P.S. § 459-211(a.1)(1-6) ....................................................................................34

3 P.S. § 459-211(b) .........................................................................................20, 27

3 P.S. § 459-211(b)(1) ....................................................................................20, 27

3 P.S. § 459-211(b)(2) ..........................................................................................20

3 P.S. § 459-211(c)(1)................................................................21, 27, 28

3 P.S. § 459-211(c)(1) (ii) ........................................................35

3 P.S. § 459-211(c)(1)(iv) ........................................................28

3 P.S. § 459-211(c)(2)................................................................22, 27, 28

3 P.S. § 459-218(a) ..................................................................36, 37, 43

3 P.S. § 459-218(c) ..................................................................7, 37

3 P.S. § 459-218(c)(1).............................................................. 7

3 P.S. § 459-218; § 459-901 ....................................................41

3 P.S. § 459-220(a) .................................................................. 7

3 P.S. § 459-901 ......................................................................36

3 P.S. §§ 459-211(a)(1-11); 459-211(a.1) ...........................26

3 P.S. §§ 459-218, 459-901 ....................................................44

3 P.S. §§ 459-218; 459-901; 459-207(h)(17).......................28

32 P.S. § 5210 .........................................................................40

32 P.S. § 679.403 ....................................................................40

32 P.S. § 693.16 ......................................................................40

35 P.S § 6020.1106 .................................................................40

35 P.S. § 6018.609 ..................................................................40

35 P.S. § 6021.107 ..................................................................40

35 P.S. § 7110.305 ..................................................................40

35 P.S. § 7130.502 ..................................................................40

35 P.S. § 721.5 ........................................................................40

35 P.S. § 723.11(b) ...................................................................................40

35 P.S. 780-124 .......................................................................................40

35 Pa.C.S. § 6018.608(3) ........................................................................44

42 U.S.C. § 2000e(b) ...............................................................................15

43 P.S. § 954(b) .......................................................................................15

52 P.S. § 1396.18i ...................................................................................40

53 P.S. § 4000.1707 ................................................................................40

7 U.S.C. § 2131 ...............................................................................41, 48

7 U.S.C. § 2143(a)(8) ..............................................................................48


**Constitutional Provisions**

Article I, § 8.............................................................................................46


**Regulations**

7 Pa. Code § 131.31(a).............................................................................35

7 Pa. Code § 131.32(d) ............................................................................35

7 Pa. Code § 21.1 .....................................................................................41

7 Pa. Code §§ 131.31, 131.32, 131.33, 131.34, 131.35, 131.36.............30

7 Pa. Code §131.16..................................................................................33

9 CFR § 1 .................................................................................................41

9 CFR § 2.1(a)(3)(iii)...............................................................................15

**Rules**

Fed. R. Civ. P. 56(c) ............................................................................................. 3

Fed. R. Civ. P. 56(e) ............................................................................................. 4

# PROCEDURAL HISTORY

On February 13, 2009, Plaintiffs filed a nine-count Amended Complaint against Dennis Wolff ("Wolff" or "Defendant") seeking to invalidate portions of Act 119.[1]  Plaintiffs raise a host of constitutional claims including alleged violations of the:  Commerce Clause (Counts II-III); Privileges and Immunities Clause (Count IV); Fourth Amendment (Count V); Due Process Clause (Count VI); Fifth Amendment Takings Clause (Count VII); Equal Protection Clause (Count VIII); and an uncodified portion of the Federal Privacy Law (Count IX).[2] Plaintiffs and Wolff have agreed to an expedited process to present this matter to this Court for final disposition.  The challenged provisions of Act 119 are constitutional and Wolff's Motion for Summary Judgment should be granted.

# STATEMENT OF FACTS

Defendants filed a Statement of Material Facts ("SMF") with their Motion. Defendants will reference facts, as appropriate, in the arguments raised below.

---

[1]  Plaintiffs did not sue the Department and such claims would be barred either by the Eleventh Amendment or because the Department is not a person for purposes of § 1983.  42 U.S.C. § 1983; *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989); *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 238 (1985); *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 98 (1984).

[2]  Count I reiterates the claims set forth in Counts II-IX and seeks a declaration that provisions of Act 119 violate these constitutional provisions.

1

## STATEMENT OF QUESTIONS

I.      Whether summary judgment in favor of Wolff on Plaintiffs' Equal Protection claim is appropriate because § 207(h, i) of Act 119 -- exemptions for certain types of kennels or requirements for commercial kennels -- are rationally related to legitimate state interests and because commercial kennels are not similarly situated to other kennels regulated by Act 119.

II.     Whether summary judgment in favor of Wolff on Plaintiffs' Takings Clause claim is appropriate because Plaintiffs' claims are not ripe and because § 211(c) of Act 119 does not violate the Takings Clause.

III.    Whether summary judgment in favor of Wolff on Plaintiffs' due process claim is appropriate because Plaintiffs' claims are not ripe and because § 211(c) of Act 119 does not violate Plaintiffs' due process rights.

IV.     Whether summary judgment in favor of Wolff on Plaintiffs' Fourth Amendment claim is appropriate because §§ 218 and 901 of Act 119 are constitutional under the *Colonnade/Biswell* doctrine.

V.      Whether summary judgment in favor of Wolff on Plaintiffs' Commerce Clause claims is appropriate because Act 119 is authorized by Congress, because § 209 of Act 119 does not discriminate against interstate

commerce and because any interference with interstate commerce is minimal and outweighed by the putative benefits of the statute.

VI.   Whether summary judgment in favor of Wolff is appropriate on Plaintiffs' Privileges and Immunities Clause claim because § 209 of Act 119 does not substantially interfere with Plaintiffs' rights to be out-of-state dealers of dogs.

VII.   Whether summary judgment in favor of Wolff is appropriate on Plaintiffs' Privacy Act claim is appropriate because refusing to supply a social security number will not be required for licensing.

## ARGUMENT

### A.   Summary Judgment Standard

"Summary judgment procedure is…an integral part of the Federal Rules as a whole, [and is] designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Summary judgment is appropriate where the moving party shows that "there is no genuine issue as to any material fact and that [he/she] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322.

To successfully oppose a motion for summary judgment, Plaintiffs cannot rely on the unsupported allegations of the Complaint and they must present more than the "mere existence of a scintilla of evidence" in their favor. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Plaintiffs must offer specific material facts that would be admissible at trial and that contradict the moving party's assertion that no genuine issue is in dispute.  *Kline v. First West Government Securities*, 24 F.3d 480, 485 (3d Cir. 1994); Fed. R. Civ. P. 56(e).

Not all facts are material and not all disputes are genuine.  A fact is "material" only if its existence or nonexistence would affect the outcome of the case under the applicable substantive law.  *Anderson*, 477 U.S. at 248.  *See also Celotex*, 477 U.S. at 323 ("a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").  A dispute is "genuine" only where a reasonable jury "could return a verdict in favor of the non-moving party."  *Anderson*, 477 U.S. at 255; *Matsushita Electric Industrial Company, Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587 (1986) ("[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial").

Speculation will not defeat a motion for summary judgment.  *Lexington Ins. Co. v. Western Pennsylvania Hosp.*, 423 F.3d 318, 332-33 (3d Cir. 2005) (citing *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) ("[s]peculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment") (emphasis

in original)).   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."   *Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007); *Matsushita*, 475 U.S. at 586 (party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts").

## B.    PDBAC Lacks Standing

PDBAC brought this action.   *See* Amended Complaint ¶¶9-11.   Notably, PDBAC is merely an elected subset of the Pennsylvania Professional Dog Breeders Association and it is the Association that is comprised of "more than 325 members with businesses across Pennsylvania."   Amended Complaint ¶9.   PDBAC is elected by the members of the Association.   *Id.*

While associations may have standing to litigate on behalf of their members, such "associational standing" exists only where the organization's members would have standing to sue in their own rights, the interests the association seeks to vindicate are germane to the organization's purpose and neither the claim nor the relief sought requires the participation of the members.   *Hunt v. Washington Apple*

*Adver. Comm'n*, 432 U.S. 333, 344 (1977); *Public Interest Research Group of New Jersey v. Magnesium Elektron, Inc.*, 123 F.3d 111, 119 (3d Cir. 1997).[3]

The claims alleged include:   Due Process Clause and Takings Clause (certain kennels will be destroyed during the appeal period); Fourth Amendment (kennels will be inspected and searched); Commerce Clause and Privileges and Immunities Clause (kennels will not be able to engage in commerce); Equal Protection Clause (commercial kennels will need to be retrofitted in certain ways); and Privacy Act Claim (social security numbers).   These claims require the participation of specific kennel owners; thus, PDBAC lacks standing.

Whether § 211(c)(2) violates the Due Process Clause or the Takings Clause depends on the underlying nature of the violation, whether an appeal was timely filed, whether the business was lost, whether damages were suffered and whether compensation was denied.  These issues are fact specific to the kennel in question.

As for the Fourth Amendment claim, the particulars of the situation and the particular kennel at issue are critical to assess whether any constitutional violation occurred.   Indeed, as to the claim that refusing entry constitutes probable cause,

---

[3]      PDBAC is an elected subset of the Association.   While the Association could try and assert "associational standing", PDBAC is once removed from it and cannot take advantage of this doctrine.

refusing entry is a fact specific determination and § 218(c)(1) specifically exempts out "private kennels" from this provision.  3 P.S. § 459-218(c)(1); 3 P.S. § 459-220(a).

With regards to the Commerce Clause or Privileges and Immunities Clause, specific facts must be known like whether a particular kennel engaged in interstate commerce or was impeded, by § 209, from doing so or was deprived of a substantial right.  Also, PDBAC arguably represents Pennsylvania kennels and, since its members lack standing for these claims, it does too.

As for the alleged violation of the Equal Protection Clause, the claim that § 207(h, i) violates this constitutional provision only relates to "commercial kennels" and only these specific kennels -- not other kennels or an elected subset of the Association that includes other types of kennels -- would have standing to challenge these provisions.

The Privacy Act Claim requires specific kennel owners because of the alleged need for social security nubers.[4]

---

[4]     As to the first element of associational standing -- members having standing to sue in their own rights -- Sladkin, Inserra, Myer and other members of PDBAC lack constitutional and prudential standing for specific claims.  These arguments are raised below.  Because members lack standing, PDBAC does too.

## C.    Section 1983 Maxims

Section 1983 does not provide a substantive right to redress.   Instead, it provides a cause of action to vindicate other Constitutional or federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).   To succeed, Plaintiffs must prove that Wolff violated rights secured to them by the U.S. Constitution or federal law, acted under color of state law, and caused damages.   *Sameric Corp. v. City of Philadelphia*, 142 F.3d 582, 590 (3d Cir. 1998).   As to the individual capacity claim, Plaintiffs must prove personal involvement by Wolff.   *Rizzo v. Goode*, 423 U.S. 362 (1976); *Rouse v. Plantier*, 182 F.3d 192 (3d Cir. 1999).

## D.    Plaintiffs' Challenges To § 207(h, i) Are Without Merit

Plaintiffs challenge § 207(h) and § 207(i) on equal protection grounds.[5]

---

[5]    Plaintiffs object to requirements designed to protect the health and welfare of dogs including, but not limited to, that the enclosures are structurally sound and maintained, have no sharp points or edges, have minimum areas, have appropriate flooring, be appropriately heated and cooled, be sufficiently ventilated, and that dogs be provided clean food and water and sanitary living conditions including parasite prevention and veterinary plans.   3 P.S. § 459-207(h, i).   As discussed below, several of the "requirements" are already imposed by federal law and by the Department's regulations that apply to all types of kennel operations.   Others, like lighting and ventilation, will be set in the future by the Canine Health Board.   3 P.S. § 459-207(h)(7, 8).   Any challenge to these future requirements is not ripe.

The Equal Protection Clause is a direction that all persons similarly situated should be treated alike.  Nevertheless, legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.  *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 440 (1985) (citations omitted) (noting that the Constitution presumes that even improvident legislative decisions will eventually be rectified by the democratic process).

When social or economic legislation is at issue, the Equal Protection Clause allows states wide latitude.  *City of Cleburne*, 473 U.S. at 440.  *See also FCC v. Beach Comm's, Inc.*, 508 U.S. 307, 313 (1993) (economic regulations that neither create a suspect classification nor infringe upon fundamental interests are presumed constitutional and must be upheld as long as they are rationally related to a legitimate state interest); *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356 (1973) (when addressing equal protection challenge to economic regulation, court consistently defers to legislative determinations as to the desirability of particular statutory discriminations); *Hahn v. U.S.*, 757 F.2d 581, 593-94 (3d Cir. 1985) (even if it treats different business models differently, economic, social welfare and regulatory legislation will be upheld if it is "rationally related to a legitimate government purpose"); *Doylestown Elec. Supply Co. v. Maryland Cas. Ins. Co.*,

942 F. Supp. 1018, 1020 (E.D. Pa. 1996) ("enactments of the Pennsylvania legislature enjoy a strong presumption of constitutionality; any doubts must be resolved in favor of finding constitutionality").

Consistent with this deferential review of economic legislation, rational distinctions may be made with substantially less than mathematical exactitude and legislation may address issues in a piecemeal fashion. *Katzenbach v. Morgan*, 384 U.S. 641 (1966) (holding that legislature may implement programs step by step); *Williamson v. Lee Optical Co.*, 348 U.S. 483-488-89 (1955) (holding that the legislature may adopt regulations that only partially ameliorate a perceived evil and defer complete elimination of the evil to future regulations -- "[e]vils in the same field may be of different dimensions and proportions, requiring different remedies" or "so the legislature may think" and the "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind" and the "legislature may select one phase of one field and apply a remedy there, neglecting the others"); *Roschen v. Ward*, 279 U.S. 337, 339 (1929) (statute is constitutional despite the fact that might have gone father than it did).

The "burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Heller v. Doe*, 509 U.S. 312, 320-21 (1994). Indeed,

the party defending the statute need not even advance reasons to establish its rational basis.  *Beach*, 508 U.S. at 313 (legislative choices are not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data); *Flemming v. Nestor*, 363 U.S. 603, 612 (1960) (it is constitutionally irrelevant what reasoning in fact underlay the legislative decision), *reh'g. denied*, 364 U.S. 854 (1960).  Plaintiffs, moreover, have "the 'heavy burden' of overcoming a presumption of rationality 'by a clear showing of arbitrariness and irrationality.'"  *Hahn*, 757 F.2d at 593-94 (quoting *Hodel v. Indiana*, 452 U.S. 314, 332-33 (1981)).

In sum, this Court may not sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.  *See also Brian B. ex rel. Lois B. v. Commonwealth of Pennsylvania, Department of Education*, 230 F.3d 582, 587 (3d Cir. 2000), *cert. denied*, 532 U.S. 972 (2001) ("the necessity of legislative line-drawing 'renders the precise coordinates of the resulting legislative judgment virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally'") (quoting *Beach*, 508 U.S. at 316).

With these settled principles in mind, Plaintiffs' equal protection claim, premised on flawed presumptions, fails.

### 1.    Section 207 Requirements That Apply To All Kennels

First, all kennels:  must be licensed, § 207(a.1); shall be maintained in a sanitary and humane condition, § 207(b); shall maintain records, § 207(c); shall place tags on dogs, § 207(d); and shall display kennel licenses, § 207(e).  Boarding kennels, non-profit kennels and Kennel Class I-VI, moreover, also must develop and follow an appropriate exercise plan and must be equipped with smoke alarms or fire extinguishers and sprinkler systems.  3 P.S. § 459-207(g).  Likewise, many of the challenged provisions apply to all business models through already existing analogous provisions in the AWA and Pennsylvania's regulations.  SMF ¶9 (comparison of Act 119, Dog Law Regulations and AWA showing considerable overlap between requirements).[6]

### 2.    Commercial Kennels Are Not Similarly Situated For Equal Protection Purposes

As noted, Act 119 regulates all types of kennels, applies to various business models and sets forth specific definitions for each type.  In that regard, separate definitions are provided for "boarding kennels", "commercial kennels", "private

---

[6]    Because these requirements apply to all kennels, they cannot support an equal protection claim.

kennels", "non-profit kennels", "rescue network kennels" and "kennels."  3 P.S. § 459-102.[7]

As pertinent here, "boarding kennels" are establishments "available to the general public where a dog or dogs are housed for compensation by the day, week or a specified or unspecified time."  3 P.S. § 459-102.  Thus, ownership of the dogs does not vest in the kennel owner; rather, ownership remains with the person seeking the boarding services and the services typically are for a limited period of time.  Also, a "boarding kennel" does not breed or whelp dogs for commercial purposes and the ultimate consumer routinely visits the boarding kennel (to drop off and pick up their dog) and can decide, based on the conditions, whether to patronize that kennel.  Accordingly, market forces work to ensure humane conditions at boarding kennels.

"Non-profit kennels" include those that are registered under the laws of the Commonwealth as a nonprofit entity or nonprofit animal control kennel.  3 P.S. § 459-102.  "Rescue network kennels" are kennels that use rescue network kennel homes and have as a goal the ultimate transfer of dogs to permanent owners.  *Id.*

---

[7]     Plaintiffs support their similarly situated argument by referring to the licensing fee that is charged.  A similar fee structure does not mean that the business models are similarly situated for equal protection purposes.

These types of kennels do not breed or whelp dogs and do not sell dogs to middle-men for a profit.  Again, this business model is markedly different from that of a commercial kennel.

"Private kennels" are kennels that do *not* meet the definition of a "commercial kennel" where dogs are kept or bred by their owners for hunting, tracking and exhibiting in dog shows, performance events or field/obedience trials. 3 P.S. § 459-102.   These kennels do not sell to middle-men for ultimate distribution to consumers -- if they did, they would meet the definition of commercial kennel -- and do not sell more than 60 dogs in a calendar year directly to ultimate dog owners -- if so, the definition of commercial kennel would be met. Also, these dogs have a specific external purpose -- hunting, tracking and exhibitions -- and, thus, significant market incentives exist to humanely treat the dogs.

Unlike other operations, a "commercial kennel" is differently defined as a "kennel that breeds or whelps dogs and:  sells or transfers any dog to a dealer or pet shop kennel; or sells or transfers more than 60 dogs per calendar year." 3 P.S. § 459-102.  And, beyond statutory definitions, "commercial kennels" are distinct business models and are geared toward breeding and whelping of dogs and the

generation of profits through ultimate sales of puppies.[8]  As part of this business

model, breeding dogs (females and males) live their entire lives at the kennels and

often are kept in small cages for their entire lives and are used to produce puppies.

SMF ¶¶13-21.  In contrast to the other types of kennels, "commercial kennels"

either sell/transfer dogs to dealers or pet shop kennels -- middlemen and not the

end consumer.  As such, the ultimate consumer of the dog may never know the

identity of the commercial kennel that bred and cared for the dog and may never be

able to perform any due diligence on the commercial kennel.

---

[8]     Based on the Bureau's most recent (2007) statistics, some 67% of breeding
kennels could meet the definition of commercial kennel.  SMF ¶26.  Thus,
Plaintiffs' implication that Act 119 seeks to punish a small subset of businesses is
baseless.  Exempting small subset of smaller or wholesale breeding kennels is
rational because kennels that interact directly with consumers are subject to the
investigation and due diligence of the ultimate consumers whereas kennels that
breed dogs and sell them to pet shops or dealers may never be subject to such
scrutiny whereas kennels that sell or transfer less than 60 dogs/calendar year
require fewer breeding dogs. ¶6-8 (60 puppies/year will require between 3 and 10
breeding dogs).  Notably, the 60 dog figure comports with the cut-off already
established by the AWA.  9 CFR § 2.1(a)(3)(iii) (exempting those dealers with
three or fewer breeding dogs).  Finally, exempting smaller businesses from certain
restrictions is common in economic legislation.  *See*, *e.g.*, 42 U.S.C. § 2000e(b)
(Title VII -- outlawing discrimination in the workplace -- only applies to
employers with more than 15 employees); 43 P.S. § 954(b) (PHRA, state analog to
Title VII, only applies to employers with more than four employees).  *See also*
*Miller v. Strahl*, 239 U.S. 426 (1915) (exception of hotels with less than 50 room
from a statute requiring hotelkeepers to take certain fire precautions).

Kennels that sell more than 60 dogs each calendar year directly to consumers are larger and different from the operations of smaller breeding kennels. These operations require more breeding dogs (male and female) to produce this number of dogs for sale each year. SMF ¶¶5-8. This difference in size means that these kennels are not similarly situated for equal protection purposes. Thus, summary judgment in Wolff's favor on the equal protection is proper because commercial kennels are not similarly situated to these other types of kennels.

### 3. A Rational Basis Exists For § 207(h, i)

Even if commercial kennels were similarly situated to other business models, Plaintiffs' equal protection challenge would fail. As noted above, it is well-settled that even where a classification is underinclusive, invalidation of the statute is not justified because the General Assembly is not constitutionally required to eradicate an entire problem -- it can address issues in a piecemeal fashion. *See*, *e.g.*, *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483 (1955).

Further, there is a rational basis for treating commercial kennels differently than other business models. As noted, commercial kennels are different than boarding kennels, private kennels, pet-shop kennels, rescue network kennels, or non-profit kennels. Commercial kennels breed and whelp dogs and sell and

transfer dogs to middle-men for profit and in significantly greater numbers than other types of kennels.  By selling to pet-shops or dealers, commercial kennels are not subject to the same market forces that result from the ultimate consumer's ability to visit a kennel.  This business model also has resulted in breeding dogs being kept in small cages for virtually all of their lives.  SMF ¶¶13-21.  Imposing these minimum standards on this different business model is rational.

Likewise, it is rational for the General Assembly to conclude that larger kennels, which are geared by profit motives in the continuous breeding and selling of dogs, need additional requirements to ensure minimum standards for these dogs that are merely used to produce additional dogs.  *See* SMF ¶¶13-21.[9]  Further, it is rational for the General Assembly to conclude that smaller kennels typically would have less revenue and, thus, imposing additional requirements on them could constitute a hardship.[10]  Moreover, monitoring and enforcing these additional requirements against every kennel would require additional resources, which, in

---

[9]     Plaintiffs assert that they have economic incentives to "produce healthy dogs for sale and to maintain a positive market image."  Amended Complaint ¶78. Plaintiffs also desire to make money; indeed, the whole thrust of Plaintiffs' report is just that.  Finally, puppies are only kept at kennels for a short period of time -- 8 weeks; breeding dogs live their entire lives under such conditions.

[10]    Plaintiffs' proffered report shows that medium and small kennels already are unprofitable.  Defendants have filed a Motion in Limine with respect to this report.

these times of budget cuts and doing more with less, could overwhelm the Department. Finally, the number 60 is more lenient than the limit set by the AWA. These rational bases defeat Plaintiffs' equal protection challenge.

## E.     Plaintiffs' Challenge To § 211(c) Is Without Merit

Plaintiffs challenge § 211(c). They argue that, by putting them temporarily out of business, the Takings Clause and the Due Process Clause have been violated. Amended Complaint ¶¶124-27, 129-33.

### 1.     Statutory Framework -- § 211

As pertinent here, § 211 applies to kennel owners who have current licenses or who are seeking renewals of existing licenses.[11]  It mandates that the secretary

---

[11]     Plaintiffs have abandoned their challenge of § 207(a.3) -- allowing the issuance of cease and desist orders to persons operating kennels without licenses. Further, Plaintiffs do not allege that they are unlicensed; thus, they lack standing to challenge § 207(a.3).  Even assuming Plaintiffs could establish standing, this pre-enforcement claim is not ripe. *Philadelphia Federation of Teachers v. Ridge*, 150 F.3d 319 (3d Cir. 1998) (dismissing, on ripeness grounds, facial due process challenge to state law); *New Hanover Township v. Army Corps of Engineers*, 992 F.2d 470, 472-73 (3d Cir. 1993) (claim was not ripe because additional agency action was required).  Similarly, since it is illegal to operate kennels without licenses, it is constitutional to stop operations that do not have licenses. *Pre-Need Family Services Eastern Region v. Bureau of Professional and Occupational Affairs*, 904 A.2d 996, 1003 (Pa. Cmwlth. 2006) (those without a license to do business have no property right in that business).  Finally, while § 211 also applies to those seeking kennel licenses for the first time, persons who were never licensed have no property interest and no constitutional claim exists when the secretary refuses them a license. *Pre-Need*.

revoke/refuse a kennel license if the licensee was convicted of violating laws regarding cruelty to animals within the past 10 years.

The secretary has the discretion to revoke, or not issue a kennel license, for other specified reasons. *See* 3 P.S. § 459-211(a)(1-11) (bases include:  making material misstatements or misrepresentations on applications or to department personnel; failing to comply with Act 119 or its regulations; convictions for cruelty to animals more than 10 years in the past if there is evidence that the person has not been rehabilitated and granting such a license would jeopardize the health, safety and welfare of dogs; convictions for felonies; violating the Consumer Protection Law; previous ordered cessations of kennel operations; agreeing with Attorney General to cease operations; being subject to an affirmative order that prohibits operation of a kennel at the location due to zoning; violating the Rabies Act; refusal or revocation of a kennel license within the past 10 years; or where others involved in the ownership or operation would be refused a license).   In assessing whether to revoke or refuse a license for certain of the criteria, the secretary is required to consider the gravity of the underlying offense and the past history of the licensee.  3 P.S. § 459-211(a.1).

Section 211 also sets forth the administrative hearing process.  Specifically, § 211(b) provides that the secretary must provide notice of the revocation or

19

refusal to the licensee.  3 P.S. § 459-211(b)(1).  This notice must set forth the general factual and legal basis for the action and must advise the affected person that, within 10 days of receipt of the notice, he/she may file a written request for an administrative hearing with the secretary.  *Id.*  The hearing must be conducted in accordance with the Administrative Agency Law ("AAL").

The written notice of revocation or refusal must be served personally or by registered mail or certified mail return receipt requested and the revocation or refusal becomes effective upon the "expiration of the ten-day period for requesting an administrative hearing, unless a timely request for a hearing has been filed with the department."  3 P.S. § 459-211(b)(2).  Thereafter:

(1)   If the secretary revokes or refuses a kennel license, dealer license or an out-of-state dealer license, *a person whose license revocation or refusal has become effective* shall comply with all of the following:

(i)   Immediately cease and desist from operating a kennel, including boarding, buying, exchanging, selling, offering for sale, giving away or in any way transferring dogs.

(ii)   Acquire no additional dogs nor increase the number of dogs in the kennel by any means, including breeding.   This subparagraph does not apply to an acquisition or increase by birth of puppies from a mother which, at the time of the order, was:

(A)   on the property;
(B)   pregnant; and
(C)   owned by the kennel or the kennel owner.

(iii)   Notify the department prior to the euthanization of any dog.   No dog may be euthanized unless it is determined by a veterinarian that the euthanasia will prevent the dog from suffering caused by a medical condition.   If a veterinarian determines a dog should be euthanized, a copy of the veterinarian's findings, signed by the veterinarian, must be provided to the department.

(iv)   Permit State dog wardens to inspect the kennel without a warrant in order to determine compliance with the department's order, any relevant court order and any provision of this act.

(v)   Divest of all dogs numbering over 25, unless directed otherwise by the department order, within a reasonable time period as determined by the department, but not to exceed ten days.   The department's order shall set forth the manner by which the kennel owner may divest of the dogs.   If there are more dogs on the premises than permitted in the department order after the expiration of the time period set forth in the order, the kennel may select the dogs to be kept, up to the number allowed under this subparagraph.   The dogs not selected shall be forfeited to the entity set forth in the department order or to an entity approved by the department without compensation to the owner.

3 P.S. § 459-211(c)(1) (emphasis added).

Section 211(c)(2) provides:

(2)   The following applies to appeals:

(i)   This paragraph applies to a person whose license is refused or revoked and who:

(A)   has timely filed a request for an administrative appeal; and

(B)   would continue to require a kennel license under this act, pending the exhaustion of all administrative appeals.

21

(ii)    A person subject to subparagraph (i) shall:

(A)    be considered to be operating under suspension;

(B)    receive notice from the department of the license being suspended; and

(C)    during the duration of all administrative appeals, and thereafter if the department's action is upheld, be subject to the requirements set forth in paragraph (1)(i), (ii), (iii) and (iv).

(iii)    Within ten days after the exhaustion of an administrative appeal under subparagraph (i)(A) in which the department's action is upheld, the kennel shall reduce the number of dogs under paragraph (1)(v).

3 P.S. § 459-211(c)(2).

## 2.    Plaintiffs' Takings Claim Is Without Merit

Section 211(c)(2) does not violate the Takings Clause; therefore, Plaintiffs'

claim must be rejected.[12]

The Takings Clause of the Fifth Amendment provides that private property

shall not "be taken for public use, without just compensation."   As its language

---

[12]    Plaintiffs do not challenge the bases for, or processes by, which the Secretary can revoke or refuse to issue a license that are set forth in § 211(a) or § 211(b).  And, as for § 211(c)(1), this provision does not negatively affect any rights of Plaintiffs because, contrary to Plaintiffs' arguments, this provision only applies when the revocation or refusal becomes final, which only occurs when the licensee fails to timely request an administrative hearing or when the administrative process concludes.   Consequently, this part of § 211(c) is constitutional and does not negatively affect Plaintiffs' rights.

makes clear, the Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 314 (1987). Put another way, the Takings Clause "'is designed not to limit the governmental interference with property rights *per se*, but rather to secure compensation in the event of otherwise proper interference amounting to a taking.'" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (quoting *First English*, 482 U.S. at 315).

Accordingly, the Supreme Court has established certain requirements that any plaintiff must meet for any takings claim to be justifiable.  Foremost, a takings claim is not ripe until "the government entity charged with implementing the regulations" reaches a "final decision regarding the application of the regulations to the property at issue" and, moreover, the claimant must have sought "compensation through the procedures" that the state "has provided for doing so." *Williamson County Regional Planning Comission v. Hamilton Bank*, 473 U.S. 172, 186, 194 (1985).  "The ripeness doctrine serves to determine whether a party has brought an action prematurely and counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *County Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006).

23

Here, Plaintiffs do not allege that Wolff revoked or refused any license. Similarly, Plaintiffs do not allege that they timely sought administrative review of any such decision. Likewise, Plaintiffs do not aver that their kennels were put out of business and Plaintiffs do not allege that they sought, and were denied, compensation for any business losses. Plaintiffs' claim is not ripe.

Recasting the takings claim as one for declaratory and injunctive relief to prevent the enforcement of § 211(c)(2) does not aid Plaintiffs. In that regard, a similar tack was recently rejected by a New Jersey federal court. In *CBS Outdoor Inc. v. New Jersey Transit Corporation*, C.A. No. 06-2428, 2007 WL 2509633 (D. N.J. 2007), *judgment aff'd*, *Carole Media LLC v. New Jersey Transit Corp.*, 550 F.3d 302 (3d Cir. 2008), the plaintiff asserted a claim for declaratory and injunctive relief under the Takings Clause.[13] The plaintiff argued that it was not seeking just compensation and, therefore, it was not required to avail itself to the state process before bringing its constitutional claim. 2007 WL 2509633 at *10.

---

[13]    In *Carole Media*, the Third Circuit concluded that the ripeness defense does not apply where a plaintiff solely alleges that the property was taken for a private use -- as opposed to a public one -- because property cannot be taken to benefit purely private interests, which had been alleged. 550 F.3d at 307-09. Here, Plaintiffs have not alleged that Act 119 takes their property for private use; indeed, at best, they allege a garden variety temporary takings claim premised on the allegations that they are being put out of business during the period of administrative appeal. Amended Complaint ¶¶129-33.

The district court rejected the plaintiff's argument because it "reflect[ed] a fundamental misunderstanding of the Takings Clause and the jurisprudence regarding it." *Id.* at *10.  Citing to the *Lingle* case, the court held that "a claim seeking 'an injunction against the enforcement of a regulation…allege[d] to be fundamentally arbitrary and irrational' quite simply 'does not sound under the Takings Clause.'" *Id.* at *10 (quoting *Lingle*, 544 U.S. at 540, 543-44 (quoting, in turn, *First English*, 482 U.S. at 315)).  Wolff's motion must be granted.

### 3.  § 211(c) Does Not Violate The Due Process Clause

Plaintiffs allege § 211(c)(1) directs all kennel activity to stop upon the filing of an appeal.  Amended Complaint ¶124.  Perhaps recognizing that the Takings Clause claim is not viable, Plaintiffs repackage this allegation as a procedural due process claim because, Plaintiffs aver, "a kennel owner is placed out of business without any meaningful opportunity to be heard."  Amended Complaint ¶127.[14]

---

[14]    By arguing that persons are placed out of business without any meaningful opportunity to be heard, Plaintiffs' claim is grounded in procedural due process.  In any event, § 211(c)(2) does not violate Plaintiffs' substantive due process rights. In cases of alleged executive action, substantive due process violations only occur where real property rights are violated by conduct that "shocks the conscience." *See Nicholas v. Pa. State Univ.*, 227 F.3d 133, 141 (3d Cir. 2000) (holding that substantive due process claims have been limited to those involving real property); *D'Altilio v. Dover Township*, C.A. No. 1:06-CV-1931, 2007 WL 2845073 at *4 (M.D. Pa. 2007) (noting that the Third Circuit has limited substantive due process claims to cases involving real property). *See also County of Sacramento v. Lewis*,

### a.    Statutory Framework -- Redux

Plaintiffs' cherry-picked characterization of Act 119 is at odds with its clear language.  Specifically, § 211(a) mandates that, for previous convictions relating to cruelty to animals, the secretary must revoke or refuse licenses.  3 P.S. § 459-211(a).  Moreover, for other specified conduct, the secretary is authorized to revoke or refuse licenses.  3 P.S. §§ 459-211(a)(1-11); 459-211(a.1) (noting that

---

523 U.S. 833, 846 (1998) ("the cognizable level of executive abuse of power is that which shocks the conscience"); *United Artists Theatre Circuit v. Township of Warrington*, 316 F.3d 392, 399-400 (3d Cir. 2003) (same).  Here, real property is not involved and the conduct -- revoking/refusing a license to a person or business for specified conduct and limiting their business operations during the appeal process -- does not shock the conscience.  Further, § 211(c)(2) does not violate the substantive due process clause because it is rationally related to the legitimate goal of protecting dogs.  *See Myrie v. Commissioner, N.J. Department of Corrections*, 267 F.3d 251, 263 (3d Cir. 2001) ("the due process clause does not authorize courts to exercise oversight with respect to the comparative efficiency, and/or relative wisdom, of the particular measure or measures that a legislature selects from a menu of possible measures reasonably calculated to achieve a permissible legislative objective" and the "legislative choice of measures is not open to judicial second-guessing"); *Sammon v. New Jersey Board of Medical Examiners*, 66 F.3d 639, 643-45 (3d Cir. 1995) (court "is not entitled to second guess the legislature on the factual assumptions or policy considerations underlying the statute" and it is "up to the person challenging the statute to convince the court that the legislative facts on which the classification is apparently based could not reasonable be conceived as true by the governmental decisionmaker"); *Knight v. Tape, Inc.*, 935 F.2d 617, 627 (3d Cir. 1991) (applying the "minimum rationality standard" to substantive due process challenges of economic and social legislation); *Meier v. Anderson*, 692 F. Supp. 546, 550 (E.D. Pa. 1988), *aff'd*, 869 F.2d 590 (3d Cir. 1989) ("[t]he right to practice one's profession is neither explicitly nor implicitly enumerated in the Constitution, and cannot, therefore, be considered a fundamental right").

the secretary shall consider the gravity of the underlying violation for misstatements and misrepresentations and that the secretary shall consider the past history of the licensee's violations when determining action for violating Act 119).

Written notice must be provided to the licensee of the secretary's decision and the notice must provide the factual and legal basis for the decision as well as the time in which the licensee can file a request for an administrative hearing. 3 P.S. § 459-211(b)(1). Any administrative hearing is conducted pursuant to the AAL and the secretary's revocation/refusal -- and the resulting restrictions placed on kennel operations -- is not effective until the 10-day appeal period expires or the administrative hearing concludes. 3 P.S. § 459-211(b).

Once a timely written request for an administrative hearing is lodged, the operator will be considered to be operating under suspension and specific limitations will be placed on the kennel operations during the appeal. 3 P.S. § 459-211(c)(2). One restriction is that the licensee must notify the department prior to euthanizing of any dog and euthanizing cannot occur unless a veterinarian determines that the euthanasia will prevent the dog from suffering caused by a medical condition. 3 P.S. § 459-211(c)(1)(iii). Another restriction is that the kennel operator must allow state dog wardens to inspect the kennel without a

warrant to determine compliance with the department's order or Act 119.  3 P.S. §

459-211(c)(1)(iv).  These provisions do not halt kennel operations.[15]

Peeling away the layers of overblown rhetoric, Plaintiffs' challenge relates

only to the limitations imposed by § 211(c)(2)(ii)(C) and § 211(c)(1)(i, ii).  During

the administrative appeal, the licensee is considered to be suspended and will

immediately "cease and desist from operating a kennel, including boarding,

buying, exchanging, selling, offering for sale, giving away or in any way

transferring dogs" and acquire no additional dogs or increase the number of dogs in

the kennel by any means including breeding except that dogs may be acquired or

increased by the birth of puppies to dogs that were pregnant at the time of the

revocation or refusal.  3 P.S. § 459-211(c)(1)(i, ii); 3 P.S. § 459-211(c)(2)(ii)(C).[16]

---

[15]    Act 119 already allows state dog wardens to inspect kennels and restricts the euthanizing of dogs.  *See* 3 P.S. §§ 459-218; 459-901; 459-207(h)(17).  Also, the divestiture of dogs never applies until after the exhaustion of the administrative appeal.  3 P.S. § 459-211(c)(1)(v).

[16]    The ability to add dogs through the birth of puppies that are pregnant at the time of the revocation/refusal means that Plaintiffs should be able to keep a healthy supply of puppies coming throughout any minimal hearing period.  Specifically, the gestation period for puppies is 63-65 days and dogs can be bred twice a year. SMF ¶6.  Puppies, moreover, cannot be sold until they are eight weeks old. Assuming Plaintiffs are operating their kennels appropriately, they will have females in all stages of pregnancy, which will result in continuous births for a period of eight weeks.

### b.   Plaintiffs' Due Process Claim Is Not Ripe

Plaintiffs' procedural due process challenge is not ripe.  Plaintiffs do not allege that the Secretary has revoked or refused any license, nor do Plaintiffs aver that they timely requested an administrative hearing.  If the Secretary takes such action in the future, if the licensees at that time timely file a request for a hearing and if those licensees are placed out of business, then a claim may be ripe for resolution.  Until that time, however, Plaintiffs' pre-enforcement challenge is not ripe and must be rejected.  *See Federation of Teachers v. Ridge*, 150 F.3d 319 (3d Cir. 1998) (dismissing, on ripeness grounds, facial challenge to state law alleging due process and contract clause theories); *New Hanover Township v. Army Corps of Engineers*, 992 F.2d 470, 472-73 (3d Cir. 1993) (dismissing claim as not ripe because additional agency action was required); *Salvation Army v. Department of Community Affairs of State of N.J.*, 919 F.2d 183, 192 (3d Cir. 1990) ("only if the official has either enforced, or threatened to enforce, the statute against the plaintiffs" is there a case or controversy for Article III purposes); *Lewis v. Rendell*, 501 F. Supp. 2d 671, 680-81 (E.D. Pa. 2007).

### c.   Plaintiffs' Due Process Claim -- Substance

Even if considered, however, § 211(c)(2) passes constitutional muster.  Without question, Act 119 provides a process by which revocation or refusal

decisions are issued and can be adjudicated.  This process includes written notice of the decision including the legal and factual basis for it.  It also includes notification of the 10-day appeal period and that any administrative hearings will be conducted under the AAL.  Under the AAL, Plaintiffs are entitled to: representation by an attorney; reasonable notice of a hearing and the opportunity to be heard; compilation of a complete record of the proceedings; the ability to proffer evidence and cross examine witnesses; submit briefs and have oral argument; and receive written adjudications with findings and reasoning.  2 Pa.C.S. §§ 502, 504, 505, 506, 507.  *See also* 7 Pa. Code §§ 131.31, 131.32, 131.33, 131.34, 131.35, 131.36 (Department of Agriculture regulations relating to administrative process).  Further, Plaintiffs have the right to seek review of any agency adjudication by a court of competent jurisdiction.  2 Pa.C.S. §§ 701, 702, 703, 704.

Thus, Plaintiffs' contention is not, and cannot be, that there is an inadequate process.  Instead, Plaintiffs challenge only the timing of the process.  It is well-settled that not all deprivations of property without pre-deprivation hearings violate due process if prompt post-deprivation hearings are provided.  *Hudson v. Palmer*, 468 U.S. 517, 531-33 (1984).  And, in assessing Plaintiffs' procedural due process claim, this Court must consider the following factors:  the private interest that will

be affected by the official action; the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and the Commonwealth's interest including the function involved and the fiscal and administrative burdens that further procedural requirements would entail. *Dixon v. Love*, 431 U.S. 105, 112-13 (1977) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

*Dixon* is analogous to the present matter and, therefore, its reasoning is particularly apt. *Dixon* involved whether Illinois provided constitutionally adequate procedures for suspending or revoking the license of a driver who had repeatedly been convicted of traffic offenses. 431 U.S. at 107. As pertinent here, the statutory scheme in *Dixon* allowed for an initial suspension/revocation decision based on official records with an administrative hearing available only after the suspension or revocation had taken effect. *Id.* Under the Illinois statutory framework, provisions existed to allow those whose licenses were suspended or revoked to obtain restricted permits for commercial use or if hardship could be demonstrated. *Id.* at 110.

Factually, the truck driver in *Dixon* received a written notice that his license was revoked. *Id.* at 111. Rather than seeking an administrative hearing, the driver filed a constitutional claim that his procedural due process rights had been violated.

31

*Id.* Like here, the driver did not challenge the adequacy of the administrative hearing; rather, he challenged the fact that he did not receive this hearing before the revocation of his license. *Id.* at 112 (describing the only question as being one of timing).

After affirming the *Mathews* factors, the Supreme Court analyzed the Illinois process. As to the first factor, the Court noted that the private interest was the license to operate a motor vehicle. While recognizing that a driver would not be made entirely whole by a later vacation of the revocation, the Court concluded that because the statute had provisions allowing persons to obtain hardship licenses, the "nature of the private interest here is not so great as to require us 'to depart from the ordinary principle, established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action.'" *Id.* at 113 (quoting *Mathews v. Eldridge*, 424 U.S. at 343).

As to the second factor, the Court concluded that since revocation decisions are largely automatic and premised on previous convictions, the risk of erroneous deprivation was minimal. *Id.* at 113-14 (driver had the opportunity for a full judicial hearing in connection with each of the underlying convictions on which the revocation was based and merely "asserting the right to appear in person only

to argue that the Secretary should show leniency and depart from his own regulations" does not "serve to protect any substantive rights").

Finally, the Court concluded that the substantial public interest in administrative efficiency would be impeded by the availability of a pre-termination hearing in every case. *Id.* at 114. Indeed, allowing hearings before revoking licenses would substantially harm the important public interest of road and highway safety and the prompt removal of safety hazards from the roads.

Here, the *Matthews* factors and *Dixon* compel upholding § 211(c)(2). First, whereas in *Dixon*, there was an ability to seek a hardship license, here the Department's own regulations allow for a licensee to seek a supersedeas to halt the impact of the Secretary's decision during the administrative hearing. *See* 7 Pa. Code §131.16. Second, Act 119's bases for revocation or refusal include: convictions for cruelty to animals; convictions for other felonies; violations of the Unfair Trade Practices and Consumer Protection Law; being required to cease and desist from operating a kennel or owning, selling or caring for dogs; entering into an agreement with the Office of Attorney General that requires the person to cease and desist from operating a kennel or owning, selling or caring for dogs; a final order declaring that the kennel is not a permitted use under the applicable zoning ordinance; having a license refused or revoked within the past 10 years. 3 P.S. §

459-211(a)(5-11). Any licensee would likely have received a full panoply of rights in these previous matters and, as in *Dixon*, the risk of erroneous deprivation is minimal.[17] Finally, restricting certain aspects of a kennel operation promptly protects the health and welfare not only of the dogs but also those who would otherwise purchase these dogs and requiring hearings before the imposition of such restrictions could further harm dogs and the public.

Plaintiffs erroneously claim that the administrative process will drag on. The grounds for revocation or refusal are specifically articulated and many are based on previous conduct that will be readily verifiable and that was subject to due process rights. A licensee who disputes the bases for a revocation or refusal can submit documentation to the Department along with its timely request for an

---

[17]     Other bases include making material misstatements or failing to comply with Act 119 or its regulations. 3 P.S. § 459-211(a)(1-4). While previous litigation may or may not have occurred with regards to the "misstatement" basis, the fact that the secretary is required to consider the gravity of the misstatement(s) and the 2009 Kennel Application asks specific questions regarding the issues set forth in § 459-211(a)(5-11). 3 P.S. § 459-211(a.1); Amended Complaint, Exhibit B. As to the failure to comply with Act 119 or its regulations, the secretary is required to consider not only the gravity of the alleged violation but also the past history of the licensee including the gravity of the violation, the number of current or past violations, the potential effect of the violation on the health and safety of the dog, whether the licensee had been previously warned to correct the violation, whether the violation resulted in a criminal conviction and the length of time between any violations. 3 P.S. § 459-211(a.1)(1-6).

administrative hearing.   Further, a petition for supersedeas can be filed in which the licensee can seek a stay of the revocation or refusal or some modification of it pending the administrative hearing.   In addition to a supersedeas, Department regulations provide that a party can seek a conference to settle, adjust the issues or expedite the matter and that hearings will not be continued except for compelling reasons.   7 Pa. Code § 131.31(a); 7 Pa. Code § 131.32(d).   Thus, Plaintiffs' claim that an administrative appeal will cripple their business is erroneous.   *See* SMF ¶6 (gestation period/heat frequency); 3 P.S. § 459-211(c)(1) (ii) (puppies can be born to females that are pregnant at the time of the revocation/refusal).[18]

## F.   Plaintiffs' Challenge To § 218 And § 901 Must Be Dismissed

Plaintiffs challenge § 218 and § 901 of Act 119 and assert that these provisions violate their Fourth Amendment rights by allowing inspections of homes and children to occur without the prior issuance of search warrants.[19] Plaintiffs mischaracterize the actual language and their challenge is otherwise without merit.

---

[18]   These same reasons compel the conclusion that Plaintiffs' claim based on the Takings Clause, even if ripe, is without merit.

[19]   Plaintiffs do not claim that they were subject to any warrantless or unreasonable inspection.   Thus, they lack standing to pursue this unripe claim.

### 1.     Statutory Framework -- §§ 218/901

Section 901 of Act 119 has existed for years and authorizes "state dog wardens and employees of the department" to "enter upon the premises of any person for the purpose of investigation.  A dog warden or employee of the department may enter into a home or other building only with the permission of the occupant or with a duly issued search warrant." 3 P.S. § 459-901.  Plaintiffs latch onto the word "premises" to argue that Act 119 allows unfettered searches into homes.  Contrary to Plaintiffs' suggestion, Act 119 does not allow willy-nilly entry into homes.  Rather, premises can be inspected and searched; however, permission or search warrants are clearly required to enter homes or other buildings.

Section 218 of Act 119 provides that "state dog wardens and other employees of the department are hereby authorized to inspect all *licensed kennels*, all dogs within the commonwealth and all *unlicensed establishments which are operated as a kennel as defined by section 206*." 3 P.S. § 459-218(a) (emphasis added).[20]   As with the § 901 argument, Plaintiffs latch onto the phrase

---

[20]     Plaintiffs do not assert that they are unlicensed.  Thus, they lack standing to press any claim with respect to Act 119's provision relating to the inspection of unlicensed establishments.

"establishments" and argue that § 218 allows unfettered searches of homes and children.

To the contrary, § 218 clearly provides that "state dog wardens and employees of the department shall inspect all *licensed kennels* within the Commonwealth at least twice per calendar year."  3 P.S. § 459-218(a) (emphasis added).  Section 218 makes clear, then, that the two-plus inspections each calendar year applies only to "licensed kennels" and, indeed, the phrase "unlicensed establishment" is not used in this provision.[21]

Further, while not constitutionally necessary, "state dog wardens and employees of the department may apply for a search warrant, upon a showing of probable cause, to any court of competent jurisdiction for the purpose of inspecting or examining any *kennel* or for removing any dog under § 207 or § 211."  3 P.S. § 459-218(c) (emphasis added).  Probable cause can be demonstrated by showing that, as to "*kennels other than private kennels*", "entry was refused" or "reasonable grounds to believe that a violation of Act 119 or its regulations has occurred."  3

---

[21]    "Kennel" is defined as an "establishment in or through which at least 26 dogs are kept or transferred in a calendar year" and "establishment" is defined as the "premises on, in or through which a dog is kept, bred, harbored, boarded, sheltered, maintained, sold, given away, exchanged or in any way transferred" and includes homes, homesteads, places of business/operation where such activities take place.

P.S. § 459-218(c) (emphasis added).   Again, then, this provision dealing with probable cause and refusal of entry, by its own terms, only applies to kennels other than private kennels.   Section 218 allows state dog wardens to apply for search warrants, based on a refusal of entry, as a way of fulfilling their duty to inspect facilities.[22]

### 2.     Warrantless Search/Inspection Maxims

Moreover, warrants are not constitutionally required to conduct inspections or searches in this heavily regulated industry.   Therefore, § 901 and § 218 are constitutional and allowing the issuance of a warrant because of refusal of entry does not violate the constitution.

The Supreme Court has upheld the search of businesses without warrants.   In *Donovan v. Dewey*, 452 U.S. 594 (1981), the court noted:

> [U]nlike searches of private homes, which generally must be conducted pursuant to a warrant in order to be reasonable under the Fourth Amendment, legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily

---

[22]     Plaintiffs do not, and cannot, claim that obtaining a search warrant because reasonable grounds exist to believe that a violation of Act 119 or its regulations has occurred violates the Fourth Amendment.   Further, when state dog wardens are refused entry, they are being prevented from fulfilling their duties, and an inspector would have no way of knowing whether a violation existed -- for probable cause purposes -- behind the closed doors of a kennel.   Thus, inspectors would be caught in a perpetual circle of refusal and inability to inspect, which would frustrate the Commonwealth's legitimate interest in inspecting licensed facilities.

violate the Fourth Amendment....The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that an owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections.

***

[A] warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.

452 U.S. at 598-99.  *See also New York v. Burger*, 482 U.S. 691, 710 (1987) (upholding warrantless search of an automobile junkyard and concluding that to be "effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential" and that "the prerequisite of a warrant could easily frustrate inspection"); *United States v. Biswell*, 406 U.S. 311 (1972) (upholding the validity of warrantless inspections authorized by the Gun Control Act); *Colonnade Catering Corp. v. U.S.*, 397 U.S. 72 (1970) (upholding the validity of warrantless inspections of businesses in the alcoholic beverage industry).   Accordingly, contrary to Plaintiffs' general argument, search warrants are not constitutionally required in a heavily regulated industry like the kennel industry.  *See also Frey v. Panza*, 621 F.2d 596, 597 (3d Cir.), *cert. denied*, 449 U.S. 1035 (1980)

(participants in a licensed and regulated industry "accept the burdens as well as the benefits of the trade").[23]

Indeed, according to the Supreme Court, a warrantless search of a closely regulated industry is reasonable -- and constitutional -- if the following criteria are satisfied. First, there must be a substantial government interest in the regulatory framework. Second, a warrantless inspection must be necessary to further this regulatory framework. Finally, the inspection program, in terms of certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant -- in other words, the regulatory statute must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. *Burger*, 482 U.S. at 702-03.

---

[23] Several other Pennsylvania statutes allow warrantless searches and inspections in other heavily regulated industries. *See*, *e.g.*, 35 P.S. § 721.5 (Safe Drinking Water Act); 35 P.S. § 6018.609 (Solid Waste Management Act); 35 P.S § 6020.1106 (Hazardous Sites Clean-Up Act); 35 P.S. § 6021.107 (Storage Tank Act); 35 P.S. § 7110.305 (Radiation Protection Act); 35 P.S. § 7130.502 (Low-level Radioactive Waste Disposal Act); 53 P.S. § 4000.1707 (Act 101); 32 P.S. § 679.403 (The Flood Plain Management Act); 32 P.S. § 5210 (Bluff Recession and Setback Act); 35 P.S. 780-124 (The Controlled Substances, Device and Cosmetic Act); 52 P.S. § 1396.18i (Surface Mining Conservation and Reclamation Act); 35 P.S. § 723.11(b) (Plumbing System Lead Safety Ban and Notification Act); 32 P.S. § 693.16 (Dam Safety and Encroachments Act); 3 P.S. § 111.53 (Pesticide Control Act).

### 3.     Application Of Cases To § 218/§ 901

Here, these elements are satisfied.   First, Pennsylvania clearly has a significant interest in the regulation of kennels.   This kennel industry has been regulated for decades (both in Pennsylvania and federally)[24] and Act 119 sets forth a comprehensive framework for the licensing, regulation, and enforcement of this industry and makes clear that searches and inspections will occur.   3 P.S. § 459-218; § 459-901; Amended Complaint, Exhibit B; *Frey*, 621 F.2d at 598 (noting the key test to be whether the industry has a "long history of governmental supervision and oversight enforced by inspection").   *See also Hodgins v. U.S. Dept. of Agriculture*, 238 F.3d 421 (6th Cir. 2000) (Table Opinion) (warrantless inspection upheld for kennels housing animals to sell to research facilities because the research animal business has a long tradition of close government supervision); *Benigni v. Maas*, 12 F.3d 1102 (8th Cir. 1993) (Table Opinion), *cert. denied*, 513 U.S. 819 (1994) (warrantless search of animal vendors upheld because of the government's substantial interest in animal welfare embodied in the AWA);

---

[24]     *See*, *e.g.*, 3 P.S. § 459-101, *et seq*. (Pennsylvania Dog Law); 7 Pa. Code § 21.1, *et seq*. (Pennsylvania regulations); 7 U.S.C. § 2131, *et seq*. (Federal Animal Welfare Act); 9 CFR § 1, *et seq*. (federal AWA regulations).  *See also Burger*, 482 U.S. at 705 n.16 (business is heavily regulated where the statutory and regulatory framework is sufficiently comprehensive and defined, so that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes).

*Harkey v. deWetter*, 443 F.2d 828 (5th Cir.), *cert. denied*, 404 U.S. 828 (1971) (warrantless inspection upheld for facilities housing certain animals); *Michigan Wolfdog Ass'n, Inc. v. St. Clair County*, 122 F. Supp. 2d 794, 806 (E.D. Mich. 2000) (warrantless inspection upheld for places housing wolf mix breeds).

Second, warrantless inspections further the statutory and regulatory goals of Act 119. To quote *Burger*, to be "effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible." *Burger*, 482 U.S. at 710. Here, pre-announced inspections will frustrate effective inspections because kennel owners would have time to conceal conditions. *See Lovgren v. Byrne*, 787 F.2d 857, 866 (3d Cir. 1986) (inspections of fishing docks are valid because "government in this case will rarely have time to obtain a warrant before the status quo is changed). *See also Biswell*, 406 U.S. at 316 (noting that "if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential").

Finally, the statutory framework informs licensees that his/her business is subject to periodic inspections for particular purposes and reasonably restricts the

scope and frequency of the inspection and search and the discretion of the inspectors.  3 P.S. § 459-218(a); Amended Complaint, Exhibit B (licensee must identify the areas where dogs are kept or housed).  To that end, and as discussed above, Act 119 notifies licensees who is subject to an inspection or search, who can conduct the inspection or search, the time, place and scope of an inspection or search and the limits of discretion for the inspection or search.  *See Benigni*, *supra*, (similar provision in the AWA, allowing for warrantless searches, was found to be a constitutionally adequate substitute).

Indeed, the fact is that by applying for a license, and by identifying the areas where dogs are kept or housed, Plaintiffs are consenting to future searches and inspections.  Further, kennel operations can consist of many buildings and significant acreage of land.  On the 2009 Kennel Application, applicants are required to set forth a detailed description of the kennel and, with this description, they must include all buildings and locations where dogs are or will be kept or housed.  Amended Complaint, Exhibit B.  The Commonwealth must have the ability to inspect all such facilities to ensure the proper enforcement of Act 119.  Homes or homesteads where such activities do not take place are not within the definition of establishment or kennel and Plaintiffs have the unilateral ability to

control where their business activities occur and should not be allowed to avoid inspection merely by moving their operations into houses.

To conclude, warrantless inspections and searches in this heavily regulated industry do not violate the Fourth Amendment to the U.S. Constitution.  Sections 218 and 901 are constitutional and must be upheld.  *See also Department of Environmental Resources v. Blosenski Disposal Service*, 523 Pa. 274, 285, 566 A.2d 845, 850 (1989) (upholding § 608(3) of the SWMA, allowing for warrantless inspections, searches and seizures at any place where solid waste is generated, stored, processed, treated or disposed -- "[w]e think that the warrantless inspection provisions of the Solid Waste Management Act…are clearly valid under the '*Colonnade-Biswell* exception' to the warrant requirement of the Fourth Amendment" because "like *Colonnade* and *Biswell*…only a single business or industry is involved; it is heavily regulated; and…anyone engaged in the business activity should be aware that because of the vital public and statutory interest society now recognizes…unannounced inspections…can be anticipated").[25]

---

[25]    The provision of the Act 119 being challenged is even more reasonable than that upheld in *Blosenski*.  First, the SWMA authorized DER, its agents and employees to conduct such searches and inspections.  35 Pa.C.S. § 6018.608(3). Here, only state dog wardens of employees of the department conduct inspections. 3 P.S. §§ 459-218, 459-901.  Second, the SWMA allows inspection of any place that generates solid waste, which could include a home.  35 Pa.C.S. § 6018.608(3).

### G.   Plaintiffs Challenge To § 209 Must Be Rejected

Plaintiffs premise the Commerce Clause claim on the argument that Act 119 attempts to regulate wholly extraterritorial business and because a $300.00 fee is charged to those receiving out-of-state dealer licenses.  Amended Complaint ¶¶98-100, 105-06.  Plaintiffs' Privileges and Immunities Clause claim is based on the $300.00 fee to those receiving out-of-state dealer licenses.  Amended Complaint ¶110.[26]

#### 1.   Pennsylvania Plaintiffs Lack Standing For Both Claims

The Professional Dog Breeders Advisory Council represents Pennsylvanians.  Amended Complaint ¶9.  Myer is from Pennsylvania.  Amended Complaint ¶12.  These Plaintiffs are not engaged in interstate commerce.  Likewise, they are not residents of other states for the Privilege and Immunities Clause claim.  Therefore, they lack standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (Article III standing requires actual injury that is causally

---

Act 119 only allows inspections of kennels and search warrants, or consent, are required to enter homes.  Third, the SWMA allows the seizure of any solid, semisolid, liquid or contained gaseous material for analysis.   35 Pa.C.S. § 6018.608(3).  Act 119 requires a warrant to remove dogs under sections 207 or 211.  Act 119 also provides some temporal context to inspections -- twice each year -- and clearly states that refusal of entry will constitute probable cause.

[26]   Like other provisions in Act 119, the license fee structure for out-of-state dealers did not change from the prior law.

connected to the conduct complained of and is likely to be redressed by a favorable decision and the injury must consist of an invasion of a judicially cognizable interest which is concrete, particularized, actual and imminent); *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (prudential standing requires plaintiffs to "fall within the zone of interests to be protected" by the law at issue).

### 2. Commerce Clause

"Congress shall have the Power…to regulate Commerce…among the several States." U.S. Const., Article I, § 8. While the commerce clause explicitly speaks only to the power of Congress to regulate interstate commerce, it has been interpreted to contain an implied limitation on the power of States to interfere with, or impose burdens on, interstate commerce. "The modern law of what has come to be called the dormant Commerce Clause is driven by concern about economic protectionism -- that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Department of Revenue of Kentucky v. Davis*, 128 S.Ct. 1801, 1808 (2008) (quotation omitted); *American Trucking Associations v. Michigan Public Service Comm.*, 545 U.S. 429, 433 (2005). The purpose of the modern dormant Commerce Clause is to "prevent a State from retreating into economic isolation." *Davis*, 128 S.Ct. at 1808.

In analyzing a Commerce Clause challenge, "[w]here the statute regulates

even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970). *See Maine v. Taylor*, 477 U.S. 131, 138 (1986). "In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Lewis v. BT Inv. Managers*, 447 U.S. 27, 36 (1980).

Put another way, the Constitution does not "displace[] States' authority to shelter [their] people from menaces to their health or safety." *American Trucking*, 545 U.S. at 434 (finding no violation of dormant Commerce Clause where trucking company challenged state law imposing annual fee on trucks engaged in intrastate hauling). *See United Haulers v. Oneida-Herkimer Solid Waste Man. Auth.*, 127 S.Ct. 1786, 1796 (2007) ("[t]he dormant Commerce Clause is not a roving license for federal courts to decide what activities are appropriate for state and local government to undertake, and what activities must be the province of private market competition"); *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 194 (2d Cir. 2007) (because consumer protection is a field traditionally subject to state regulation, "[w]e should be particularly hesitant to interfere with the [State's]

efforts under the guise of the Commerce Clause").

Even if PDBAC and Myer had standing -- and as it relates to Sladkin and Inserra -- Pennsylvania's Dog Law is an exercise of the state's traditional police power in relation to domestic animals. *Nicchia v. New York*, 254 U.S. 228, 230-31 (1920). Pennsylvania's traditional authority over this subject has been preserved and expressly authorized by the federal Animal Welfare Act. *See* 7 U.S.C. § 2143(a)(8) (savings clause of the AWA that expressly provides for additional state regulation in this area). "Where state or local action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce." *White v. Mass. Council of Constr. Employers, Inc.*, 460 U.S. 204, 213 (1983).[27]

Accordingly, Plaintiffs' commerce clause claim fails. *See also Dehart v. Town of Austin*, 39 F.3d 718, 723-24 (7th Cir. 1994) (rejecting Commerce Clause challenge to local ordinance that exercised city's traditional powers for the protection of the health and safety and the public and the regulation of animals); *American Canine Foundation v. Sun*, No. 06-4713, 2007 WL 4208358 at * 9-10

---

[27]     Act 119's purpose is no different than those of the AWA. *See*, *e.g.*, 7 U.S.C. § 2131 (1) ("to insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment").

(N.D. Cal. 2007) (rejecting Commerce Clause claim where local ordinance did not unjustifiably discriminate against out-of state entities and sought to protect public from menaces to health and safety by requiring that all dogs owned or kept within city's jurisdiction be spayed or neutered in order to control animal overpopulation and to reduce euthanasia rate, incidence of public safety problems caused by stray dogs, etc.); *Kerr v. Kimmel*, 740 F. Supp. 1525, 1529 (D. Kan. 1990) (Kansas Animal Dealer Act, which provides for quality control and humane treatment of animals, is exercise of the state's traditional police power in relation to domestic animals).

Indeed, Act 119 merely requires out-of-state dealers to have Pennsylvania licenses to do business in Pennsylvania and charges comparable rates for the licenses.   Contrary to Plaintiffs' allegation, this requirement does not wholly regulate extraterritorial business.  *See Railway Express Agency v. Commonwealth of Virginia*, 282 U.S. 440, 444 (1931) (finding no commerce clause violation where Virginia required state charter as prerequisite of doing business in Virginia); *Tolchin v. Supreme Court of the State of New Jersey*, 111 F.3d 1099, 1109-10 (3d Cir.), *cert. denied*, 522 U.S. 977 (1997) (upholding, against commerce clause challenge, requirements of maintaining a New Jersey office because it applied equally to New Jersey based, and non-New Jersey based, attorneys and is

49

rationally related to accessibility of attorney to clients, courts, counsel and parties).[28]

Plaintiffs' belated challenge to the $300 license fee fares no better.  As noted, while the purpose of the dormant commerce clause is to prevent "state and local governments [from using] their regulatory power to favor local enterprise by prohibiting patronage of out-of-state competitors or their facilities" -- *C&A Carbone, Inc. v. Town of Clarkson*, 511 U.S. 383, 394 (1994) -- its "purpose…is not to protect individual firms." *Gallenthin Realty Development, Inc. v. BP Products of North America*, 2005 WL 408041 at *2 (E.D. Pa. 2005), *aff'd*, 163 Fed. Appx. 146 (3d Cir.), *cert. denied*, 127 S.Ct. 57 (2006).

Here, the relevant comparison is between out-of-state dealers and Pennsylvania dealers.  Out-of-state dealers are charged $300.00 for a license plus

---

[28]    Plaintiffs' "extraterritorial" argument is confusing at best.  Pennsylvania has the authority to require Pennsylvania, as well as out-of-state, dealers to obtain licenses to do business in the Commonwealth.  *See*, *e.g.*, 3 P.S. § 459-209 (out-of-state dealer fees) and 3 P.S. § 459-201, § 459-206 (intrastate dealer fees); 3 P.S. § 459-210 (requiring both intrastate and interstate dealers to possess a bill of sale for each dog purchased or transported); 3 P.S. § 459-211 (identical standards of licensing and humane treatment of dogs apply to both); 3 P.S. § 459-214 (all dogs imported into Pennsylvania must be certified as healthy).

the appropriate kennel license fee.  3 P.S. § 459-209(a).[29]  Pennsylvania dealers are charged the same fee as a commercial kennel as calculated based on the number of dogs sold, offered for sale or maintained by the applicant.  3 P.S. § 459-209(a.1).  This fee, therefore, can range from $75.00/year to $750.00/year.  Plaintiffs have proffered no evidence that this minimal $300 charge somehow interferes with their interstate commercial opportunities.  Indeed, the numbers of out-of-state licensees have increased over the past few years -- 26 in 2006, 39 in 2007 and 49 in 2008.  SMF ¶23.  Also, Inserra held an out-of-state license for all of these years and Sladkin held this license in 2007 and 2008.  SMF ¶23.  Both have applied for out-of-state licenses for 2009.  SMF ¶23.  These facts, along with the number of dogs sold (at least by Inserra), belie Plaintiffs' claim that their ability to engage in interstate commerce has been burdened by this $300 fee.  SMF ¶25.

Under Act 119, Pennsylvania kennels cannot "knowingly accept, receive, buy, barter or exchange a dog with an unlicensed out-of-state dealer for resale."  3 P.S. § 459-209(b).  Because of this new requirement, prosecution against Pennsylvania kennel owners for buying dogs in Pennsylvania from out-of-state

---

[29]     Actually, out-of-state dealers pay the kennel fee based on the amount of dogs that are transacted in Pennsylvania.  Thus, even if a New Jersey kennel houses thousands of dogs in New Jersey, unless it transacts 26 dogs in Pennsylvania, no kennel license fee is due -- only that $300.

dealers who are not licensed may occur and, if so, will require additional resources from the Department.  SMF ¶24.

Moreover, the Department maintains a list, which is accessible via the internet, of those out-of-state dealers who are licensed by the Commonwealth. Further, to ensure that all Pennsylvania kennels know what out-of-state dealers are licensed by the Commonwealth, the Department is now required to annually provide a list of licensed out-of-state dealers to all Pennsylvania licensed kennels. 3 P.S. § 459-209(c).  This list is provided through a mailing by the Department. The Department also is available for calls to confirm the license status of out-of-state dealers.  Act 119 allows Pennsylvania licensees to request written approval from the Department to do business with unlicensed out-of-state dealers.  3 P.S. § 459-209(c).  These requests will necessarily involve investigation into, and a review of, the unlicensed out-of-state dealer.  Act 119, then, imposes additional administrative burdens on the Department and these additional burdens require additional funds.  SMF ¶24.  The $300 fee does not violate the dormant Commerce Clause because there is a reason, apart from the location of the dealer, for this minimal fee.

In sum, Act 119 does not discriminate against out-of-state entities.  It requires all dealers, whether operating intrastate or interstate, to secure the

appropriate license for a comparable fee.  Act 119 does not impose significant, if any, burdens on interstate trade or travel.  It simply reflects the exercise of traditional police power relating to the regulation of domestic animals.  Its goals are the legitimate aims of quality control, humane treatment and the prevention of disease and abuse.  Any incidental burden on interstate commerce is outweighed by the expressly stated local benefits.  *See American Trucking*, 545 U.S. at 434.[30]

### 3.     Privileges And Immunities

The Privileges and Immunities Clause provides that the "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."   Like other constitutional provisions, however, the Privileges and Immunities Clause is not absolute.  Thus, where there is a substantial reason for the alleged differential treatment and where the alleged difference bears a substantial relationship to the Commonwealth's objective, this claim fails.  *See A.L. Blades & Sons, Inc. v. Yerusalim*, 121 F.3d 865, 870 (3d Cir. 1997) (setting forth standard).

As shown above, there is a substantial reason for charging this minimal amount.  Put simply, the $300 is not a substantial amount of money and, in fact,

---

[30]     The fee structure has been the law since 1996 and has never been challenged.  Previously, Defendant was required to check health records and bills of sale for dogs.  SMF ¶24.  This duty continues in Act 119 and, as noted, this new law adds requirements relating to out-of-state dealers; however, the fee was not increased.

the total amount for 2008 was less than $15,000.  Assuming a similar total for this year, this insignificant amount of money is needed to provide necessary resources to Pennsylvania kennels to protect them from doing business with unlicensed out-of-state dealers or to provide written approvals for doing business with unlicensed dealers.  This money is also needed to ensure the safe importation of dogs into the Commonwealth.[31]

## H.   Plaintiffs' Challenge To The Privacy Act Must Be Rejected

Plaintiffs allege that the 2009 Kennel Application contains a blank where social security numbers were requested and, thus, violates an uncodified portion of the Federal Privacy Act.  Amended Complaint ¶149.[32]

Act 119 contains no such requirement.  In addition, Plaintiffs attached, as Exhibit D to their Amended Complaint, a memo from the Bureau of Dog Law Enforcement dated December 12, 2008.  This memo clearly states that providing a social security number is not required and that license applications will be processed without such information.  Plaintiffs' claim under the Federal Privacy Act is moot and must be rejected.

---

[31]   Fees generated through Act 119 go to the Dog Law Restricted Account to implement the Dog Law.  3 P.S. § 459-1001(a).

[32]   The 2009 Application requests a Social Security *or* Federal ID number. Providing the latter does not implicate the Federal Privacy Act.

## CONCLUSION

For these reasons, then, Defendant respectfully requests that this Court grant summary judgment in his favor and dismiss, with prejudice, Plaintiffs' Amended Complaint.

Respectfully submitted,

**THOMAS W. CORBETT, JR.**
**Attorney General**

**By:**   s/Kenneth L. Joel
      **KENNETH L. JOEL**
      **Senior Deputy Attorney General**
      **Attorney I.D. #72370**

**Office of Attorney General**      **SUSAN J. FORNEY**
**Litigation Section**      **Chief Deputy Attorney General**
**15th Floor, Strawberry Square**      **Chief, Civil Litigation Section**
**Harrisburg, PA  17120**
**Phone:  717-705-7327 - Direct**
**Fax:      717-772-4526**
**kjoel@attorneygeneral.gov**

**Date:  April 3, 2009**

## CERTIFICATE OF WORD COUNT

I, Kenneth L. Joel, Senior Deputy Attorney General, hereby certify that, the Brief in Support of Motion for Summary Judgment filed on April 3, 2009 contains 12,855 words and 55 pages.  In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

**By:**   s/Kenneth L. Joel

**KENNETH L. JOEL**
**Senior Deputy Attorney General**
**Attorney I.D. #72370**

## CERTIFICATE OF SERVICE

I, Kenneth L. Joel, Senior Deputy Attorney General, hereby certify that on

April 3, 2009, I caused to be served the foregoing document via e-mail through the

Middle District's electronic filing system upon the following individual:

Leonard G. Brown, III, Esquire
Clymer & Musser, P.C.
408 W. Chestnut Street
Lancaster, PA  17603
*(Counsel for Plaintiffs)*

**By:**   s/Kenneth L. Joel
        **KENNETH L. JOEL**
        **Senior Deputy Attorney General**
        **Attorney I.D. #72370**