UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PROFESSIONAL DOG BREEDERS ADVISORY COUNCIL, INC; NAT SLADKIN; SUSAN INSERRA; and NATHAN MYER, | ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No:09-258 |
| | ) |
| | ) (Honorable Sylvia Rambo) |
| DENNIS WOLFF, SECRETARY PENNSYLVANIA DEPARTMENT OF AGRICULTURE, | ) ) ) |
| | ) |
| Defendant. | ) |

**BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ....................................................................... i

TABLE OF AUTHORITIES ............................................................. iv

INTRODUCTION .............................................................................. 1

PROCEDURAL HISTORY ................................................................ 2

STATEMENT OF THE FACTS......................................................... 2

      *Pennsylvania Dog Industry* ..................................................... 4

*Treatment of Out-of-State Dealers*.............................................. 6

*Searches* .................................................................................. 8

*Treatment of Commercial Kennels* ............................................ 9

*2009 Renewal Form*................................................................. 12

STANDARD OF REVIEW................................................................ 13

ARGUMENT ................................................................................ 14

I.      Act 119's Requirement That Out-of-State Residents Pay $300 More For A Dealer License is A Per Se Violation of the Commerce Clause ............................................................... 15

II.     Act 119 Violates the Privileges and Immunities Clause......... 18

III.    Act 119's Provisions for Limitless Warrantless Searches of Homes and Businesses Violate the Fourth Amendment of the United States Constitution ................................................... 22

        A.   *Kennels do not meet the very specific requirements for pervasively regulated industries* .................................... 26

        B.   *Act 119 fails to fulfill the narrow administrative warrantless search exception to the Fourth Amendment.* 30

        C.   *Act 119 allowance for warrantless searches of business, homes and persons is unconstitutional.* .......................... 31

IV.     The Arbitrary and Unreasonable Restrictions Placed on Commercial Kennels by Act 119 Violate the Equal Protection Clause of the Fourteenth Amendment. ................................. 32

V.      Act 119 Mandates Unconstitutional Taking of Private Property in Violation of the Takings Clause of the Fifth Amendment to the United States Constitution ............................................. 50

VI.     Act 119's Provision that the Exercise of Fourth Amendment Rights Subjects A Person to Criminal And Civil Penalties and its Requirement that A Kennel Owner Suffer the Forfeiture of Property in Order to Exercise Procedural Due Process Rights

Violates the Due Process Clause of the Fourteenth Amendment ...................................................................................... 58

VII.   The Commonwealth must be enjoined from flaunting the Privacy Act ............................................................................ 61

CONCLUSION ............................................................................. 63

CERTIFICATION OF WORD COUNT ........................................... 65

CERTIFICATE OF SERVICE......................................................... 66

# TABLE OF AUTHORITIES

**Cases**

*Afran v. McGreevey*, 115 Fed. Appx. 539, 543 (3rd Cir. 2004) ........ 14

*Allinder v. Ohio*, 808 F.2d 1180, 1187 (6th Cir. 1987) .............. 28, 29

*Anobile v. Pelligrino*, 303 F.3d 107, 120-21 (2nd Cir. 2001). ........... 32

*Ash v. Redevelopment Auth.*, 143 Fed. Appx. 439, 441 (3d Cir. 2005). ................................................................................... 50

*Blackwelder v. Safnauer*, 866 F.2d 548, 551-52 (2nd Cir. 1989) .... 32

*BMW of North America Inc. v. Gore*, 517 U.S. 559, 571 (1996) ....... 16

*Cienega Gardens v. United States*, 503 F.3d 1266, 1279 (Fed. Cir. 2007) ................................................................................... 54

*Circle School v. Phillips*, 270 F. Supp. 2d 616, 626 (E.D. Pa. 2003) 46

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446 (1985). ............................................................................ 33, 45

*Colonnade Corp. v. United States*, 397 U.S. 72 (1970) ................... 27

*Corfield v. Coryell, 6 F. Cas. 546, 552* (No. 3,230) (CCED Pa. 1825). ................................................................................... 20

*Doe v. Pennsylvania Board of Probation and Parole*, 513 F.3d 95, 107 (3d Cir. 2008). ........................................................... 47, 48

*Donovan v. Dewey*, 452 U.S. 594 (1980) ...................................... 27

*First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U.S. 304, 314 (1987) ...................................... 50

*Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996)........... 16, 17, 22

*GMC v. Tracy*, 519 U.S. 278, 307 n15 (1997) ................................ 13

*Goss v. Lopez*, 419 U.S. 565, 579 (1975)....................................... 59

*Grannis v. Ordean*, 234 U.S. 385, 394 (1914) ............................... 60

*Haugh v. Allstate ins. Co.*, 322 F.3d 227 (3rd Cir. 2003)................. 13

*Henneford v. Silas Mason Co., 300 U.S. 577, 584 (1937)*................ 17

*Hicklin v. Orbeck, 437 U.S. 518 (1978)* ......................................... 19

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 350 (1977) ................................................................................................ 16

*Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621 (1969)...... 45

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536, (2005)... 50, 51, 53, 57

*Lucas v. S.C. Costal Council*, 505 U.S. 1003, 1016 (1992). 14, 54, 55

*Lutz v. City of York*, 899 F.2d 255, 269 (3rd Cir. 1990) ................... 46

*Marshall v. Barlow's, Inc.*, 436 U.S. 307, 310 (1978)............... 22, 28

*Marshall v. Wait*, 628 F.2d 1255, 1259 (9th Cir. 1980)................... 28

*Meritcare, Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214 (3d Cir. 1999)................................................................................................ 13

*Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950)... 60

*New Hampshire v. Piper*, 470 U.S. 274, 279-80 (1985)............ 18, 20

*New York v. Burger*, 482 U.S. 691, 693, 702-03 (1987)......... passim

*Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 99 (1994) ................................................. 17

*Parratt v. Taylor*, 451 U.S. 527, 535 (1981)................................... 14

*Penn Central Transportation Company v. New York City*, 438 U.S. 104 (1978)....................................................................... 56, 57

*Phillips v. Wash. Legal Found.*, 524 U.S. 156, 160 (1998)............. 54

*Plyler v. Doe*, 457 U.S. 202, 217 (1982)....................... 14, 33, 45, 46

*Romer v. Evans*, 517 U.S. 620, 631 (1996)................................... 48

*Schmerber v. California*, 384 U.S. 757, 767 (1966) ......................... 22

*Shapiro v. Thompson*, 394 U.S. 618 (1969) ................................... 45

*Shoemaker v. Handel*, 795 F.2d 1136 (3rd Cir. 1986)..................... 31

*Shuman v. Penn Manor School Dist.*, 422 F.3d 141, 151 (3rd Cir. 2005).................................................................................... 33

*Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942)........ 45

*Stollenwerk v. Miller,* No. 04-5510, 2006 U.S. Dist. Lexis 7048 (E.D.Pa. 2006). ........................................................................... 62

*Toomer v. Witsell, 334 U.S. 385, 395 (1948)*.................................. 18

*Tucson Women's Clinic v. Eden*, 379 F.3d 531, 550-51 (9th Cir. 2004)............................................................................................ 28

*United Building & Construction Trades Council v. Mayor & Council of Camden*, 465 U.S. 208 (1984)...................................................... 1

*United States v. Biswell*, 406 U.S. 311 (1972) ................... 26, 27, 28

*United States v. Williams*, 124 F.3d 411, 422 (3rd Cir. 1997) ......... 45

*Ward v. Maryland, 12 Wall. 418 (1871)*................................... 18, 19

*Welsh v. Wis.,* 466 U.S. 740 (1984)............................................... 59

*West Virginia University Hospitals, Inc. v. Rendell*, 2007 U.S. Dist. LEXIS 81901 (M.D. Pa. Nov. 5, 2007) ........................................ 48

*Winston v. Lee*, 470 U.S. 753, 760 (1985) ..................................... 22

**Statutes**

15 Pa.C.S. § 1984 *et seq.*............................................................. 53

2009 Kennel License Application.............................................. 58, 59

5 U.S.C. § 552 ............................................................................... 59

7 Pa. Code § 21.23(b) .............................................................. 37, 38

7 Pa. Code § 21.26. ....................................................................... 42

Act 119 § 102 ................................................................ 8

Act 119 § 206 ................................................................ 5

Act 119 § 207 (i) p. 1 .................................................. 39

Act 119 § 207(i) ............................................................ 38

Act 119 § 207(i)(1), 207(i)(6)(ii) ................................. 10

Act 119 § 209(a) ......................................................... 20

Act 119 § 209(b) .......................................................... 7

Act 119 § 211(c) ................................................... passim

Act 119 § 218 ................................................................ 8

Act 119 § 903 ................................................................ 8

Act 119 §903 ................................................................ 7

Act 119 of 2008 ..................................................... 1, 2, 3

Act 119, § 1 ................................................................ 32

Act 119, § 207(h)(17). ................................................ 39

Act 119, § 207(h)(7) .................................................... 40

Act 119, § 207(i) ......................................................... 53

Act 119, § 207(i)(1) ..................................................... 38

Act 119, § 209 ............................................................ 16

Act 119, § 211(c) ......................................................... 53

Act 119, § 211(c)(i)-(ii) ............................................... 53

Act 119, § 211(e)(2.1) ................................................. 49

Act 119, § 218 ............................................................ 24

Act 119, § 220 ............................................................ 24

Act 119, § 220(A) ....................................................... 23

Act 119, § 221 ............................................................... 40

Act 119, §§ 207(a.3)(2) and 211(d)(2) ............................ 56

Act 119, §§ 218 and 220................................................. 9

Act 119, sec. 207(a.3) .................................................. 58

Fed. R. Civ. P. 56 (c) ................................................... 13

Privacy Act of 1974, Pub.L. 93-579, § 7(b), 88 Stat. 1896, 1909
    (1974) 5 U.S.C. § 552a note..................................... 59

## Other Authorities

Economic Impact Report of Wayne A. Knoblauch, Ph.D... 10, 32, 42,
    47

## Constitutional Provisions

U. S. Const. amend. IV.................................................. 22, 25, 29

U.S, Const, amend. XIV................................................. 21

U.S. Const. amend. V..................................................... 49, 56

U.S. Const. amend. XIV, § 1. .......................................... 31

U.S. Const., Art. I., §8, cl.3........................................... 15

U.S. Const., Art. IV, § 2 ............................................... 17

# **INTRODUCTION**

Whether it be raising dogs for sale or working in the oil and gas industry, the pursuit of a common calling is a fundamental privilege of the citizens of the United States. *See United Building & Construction Trades Council v. Mayor & Council of Camden*, 465 U.S. 208 (1984). Six months ago the governor of Pennsylvania signed Act 119 of 2008, an Act that "was intensively supported by the Bureau of Dog Law Enforcement" and that established unprecedented legal rights for a small number of dogs in Pennsylvania. (*See* March 1, 2009 Report to the Pennsylvania General Assembly p.3 attached as Ex. J to Pls.' Mot. Summ. J.) The breadth of the Act potentially reaches into the home of every family in Pennsylvania owning two or three dogs capable of having puppies in the same year. The law makes it economically impossible for only commercial kennels to stay in business, exposes homes and businesses to warrantless searches, takes property without a hearing or compensation and intentionally targets one group of people for unequal, unconstitutional treatment. Because the law violates numerous provisions of the United States constitution, portions of it must be enjoined.

## **PROCEDURAL HISTORY**

On February 9, 2009, plaintiffs filed the instant action seeking declarative and injunctive relief.  Plaintiffs amended their complaint on February 13, 2009 and defendant filed its answer on February 20, 2009.  Defendant agreed to an injunction of a portion of Act 119 and the court entered the injunction as an order of the court on February 18, 2009.   Given that the bulk of the challenged legislation takes effect on October 9, 2009, and that plaintiffs must determine whether to end or modify their operations, the parties agreed to an expedited disposition of this challenge which the court approved on February 18, 2009.  Plaintiffs now file their motion for summary judgment and this brief in support of that motion.

## **STATEMENT OF THE FACTS**

On October 9, 2008, Governor Edward Rendell signed Act 119 of 2008 ("Act 119" or "the Act") into law.  (Attached as Ex. A to Pls.' Mot. Summ. J.)[1]   This Act created sweeping changes to Pennsylvania's Dog Laws giving some dogs heightened protection that no other animal in the Commonwealth enjoys.   The Pennsylvania Department of Agriculture ("PDA") views Act 119 as

---

[1] All exhibits referenced by Plaintiffs are attached to their motion for summary judgment.

"the most significant" change in the issues and businesses related to dogs.   (*See* 2009 Report of BDLE to General Assembly p. 1 attached to Pls.' Mot. Summ. J. as Ex. J).  PDA describes Act 119 as "an overhaul of the Pennsylvania Dog Law that raised the bar for commercial breeding kennel owners, and transformed this law into the most progressive in the nation."[2]  (*Id.*)  While recognizing that it has now created an unequal system PDA fails to recognize that the bar has been raised to an unattainable and unconstitutional height for commercial kennel owners.

Although never stated in the Act, its purpose is purportedly to protect the health, safety and welfare of the dogs.  The Act attempts to accomplish this purpose by: (A) charging out-of-state residents $300 per dealer license in-state residents pay; (B) creating an Orwellian administrative search framework reaching into the home and onto the person of kennel owners; (C) singling out only one segment of dogs for heightened, economically infeasible regulation; (D) shutting down kennels prior to providing any due process, destroying the kennel's income cash stream and making it

---

[2]  This is a modest assertion by the PDA.  Based our research the law is the most commercially regressive in the entire western world.  (*See* e.g. United Kingdom Animal Welfare Act of 2006, accessible at: http://www.opsi.gov.uk/acts/acts2006/pdf/ukpga_20060045_en.pdf; European Convention for the Protection of Pet Animals, accessible at: http://conventions.coe.int/Treaty/en/Treaties/Html/125.htm)

impossible for the kennel to comply with the law; and, (E) undertaking to implement the Act by use of a 22-page license renewal application that seeks to regulate out-of-state commercial transactions and collection of social security numbers.

### *Pennsylvania Dog Industry*

There are more than 2,600 dog kennels in the Commonwealth of Pennsylvania.  (*See* 2009 Report of BDLE to General Assembly attached to Pls.' Mot. Summ. J. as Ex. J).  Kennels operating for profit earn the overwhelming amount of their income through the sale of puppies.  (Decl. Myer ¶ 4 attached to Pls.' Mot. Summ. J. as Ex. F).  The wholesale cost of popular breeds of puppies range from $150 to $ 400 and the retail cost range from $ 250 to $ 550.  (*See id.*)  Puppies are saleable from 8 to 12 weeks old.  (Decl. Myer ¶ 5)  Puppies older than 12 weeks are generally worth one half of their initial value until reaching 17 weeks of age when they become worthless.  (*See id.*)

Female dogs are bred so that they bear a litter of puppies every seven to eight months.  (Decl. Myer ¶ 6)  At any given time at least 15% of the female dogs in a well-run kennel are birthing puppies.  (*See id.*)  After having a litter of puppies the dogs are bred

again twenty weeks later.  (*See id.*)  The cycle of puppy births is such that at all times the female dogs in the kennel are either bred and carrying puppies or birthing puppies and preparing for being bred again.  (*See id.*)  To maintain a constant stream of puppies for sale, female dogs must be continually bred and puppies born and sold, otherwise the income stream to run the business dries up and the kennel must cease operation.  (Decl. Myer ¶ 7)

Today, PDA recognizes eight categories of kennels, including "boarding kennel," "commercial kennel," "dealer kennel," "non-profit kennel," "pet shop-kennel," "private kennel," "rescue network kennel," and "research kennel."  (Act 119 § 206 p. 11, Ex. A). Dealer kennels, pet shop-kennels, private kennels, rescue network kennels, and research kennels are all subdivided into six kennel "classes" based on capacity ranging from up to 50 dogs to more than 500 dogs, with licensing fees ranging from $75 to $750 per year.  (*See id.*)  Likewise, commercial kennels are subdivided into the same six kennel "classes" with the same fees.  (*See id.*) Boarding kennels are charged varying license fees of $100 to $250 per year based on the number of dogs they can accommodate.  (*See id.*)  Non-profit kennels are charged a flat $25 per year fee and the

Act places no limit on the number of dogs that can be housed at a non-profit kennel.

### *Treatment of Out-of-State Dealers*

Plaintiffs Nat Sladkin and Susan Inserra are residents of the State of New Jersey and also own pet stores there. (Decl. Sladkin ¶¶ 2-3, attached as Ex. G to Pls.' Mot. Summ. J.; Decl. Inserra ¶¶ 2-3 attached as Ex. H to Pls.' Mot. Summ. J.) Mr. Sladkin has owned and operated a pet store in the State of New Jersey for twenty-seven years, (*id.*) while Ms. Inserra has owned her pet store for more than five years. (*Id.*)

Mr. Sladkin routinely purchases puppies from kennels in Pennsylvania and is listed as a licensed out-of-state dealer by the Pennsylvania Bureau of Dog Law Enforcement. (Decl. Sladkin ¶ 4) As a licensed out of state dealer he has been required to pay $300 more for a dealer license than if he were an in-state dealer. If he was merely a resident of Pennsylvania he would not be subject to this increased cost. (*See id.*) The sole fact that he is a resident of another state forces him to pay more for his dealer license than a resident of Pennsylvania pays. (*See id.*)

Mr. Sladkin has paid his out of state dealer fee for 2009 of

$1050, which includes the Kennel Class VI fee of $750 plus $300 because he is a resident of another state.  He has paid this $300 premium for the past eight years.  (Decl. Sladkin ¶ 5)

The Pennsylvania Department of Agriculture has never inspected Mr. Sladkin, has never reviewed his records and he has never even met one agent of the Pennsylvania Bureau of Dog Law enforcement.  (*See id.* at ¶ 7)  Mr. Sladkin knows of no action the Commonwealth takes that would cause it to incur extra expenses for his purchase of puppies in Pennsylvania, probably because none exists.  (*See id.*)

Like Mr. Sladkin, the PDA has never inspected Ms. Inserra, never reviewed her records and has never even spoken with her. (Decl. Inserra ¶ 7).  Unlike Mr. Sladkin, however, Ms. Inserra has refused to pay the $300 premium for 2009, but has done so in the past so that she can purchase puppies in Pennsylvania for her pet store.  (*See id.* at 5 – 6 )

An out-of-state dealer who refuses to pay the $300 non-Pennsylvania-resident-fee will not receive a license.  If that dealer engages in commerce within Pennsylvania, she becomes subject to civil and criminal penalties to include imprisonment.  (*See* Act 119

§903, Ex. A. p. 42).  Likewise, an in-state dealer who engages in commerce with an unlicensed out-of-state citizen is subject to civil and criminal penalties.  (Act 119 § 209(b); § 903, Ex. A pp. 20, 42)

In November 2008, PDA mailed Kennel License Renewal Applications to kennel owners.  (*See* Application attached as Ex. B to Pls.' Mot. Summ. J.)  Among other things, this renewal license form required all applicants to disclose all out-of-state dealers with whom the applicant is "currently dealing" and demanded an admission that the applicant "will immediately stop dealing with such unlicensed out-of-state dealer" until the dealer pays the out-of-state premium and obtains a license from the PDA.  (*See id.* p.13)

### *Searches*

Searches of kennels for compliance and enforcement are mandated to occur at least two times each year.  (*See* Act 119 § 218).  The results of the searches may lead to violations of the Dog Laws and are punishable by fines and imprisonment.  (*See* Act 119 § 903).  By operating any type of kennel[3] the owner opens himself up to far-reaching searches of his home, homestead, place of business, person and property.  (*See* Act 119 § 102 definition of

---

[3] A kennel is any place having 26 dogs and puppies within a year period.  (Act 119 § 102).

"Establishment").  These searches occur without any restrictions on their scope, time or place.  No warrant is required for PDA agents to search the home and person of kennel owners.  (*See id.* at §§ 218 and 220).  In fact, should a kennel owner object to a warrantless search, the mere refusal is defined by the Act as probable cause to support the issuance of a warrant and is a violation subject to punishment.  (*See id.*).

### *Treatment of Commercial Kennels*

Commercial kennels are targeted and singled out for disproportionate scrutiny while leaving the health and welfare of dogs in similar kennels to the whim of the owners.  (*See* 2009 Report of BDLE to General Assembly p. 1 attached to Pls.' Mot. Summ. J. as Ex. J).  While the adjective of "commercial" conjures up visions of a product that is mass-produced, the reality is far from the vision.  Someone with three female dogs that, during the year, have a litter of eight puppies each is a "commercial" kennel if just one of those puppies is sold to a pet store.  (Act 119 § 102, p. 4, Ex. A).

Act 119 contains pages of statutory requirements applicable only to commercial kennels, specifically designated as "Additional

requirements for Kennel Class C license holders only." (Act 119, §§ 207(h) and 207(i)) (*See also* 39 Pa.B. 310, January 17, 2009, attached hereto as Ex. E, singling out commercial kennels. The PDA's report to the legislature at page 3, attached as Ex. J, recognizes these provisions as "temporary guidelines.")

Among the many additional requirements of commercial kennels, a stunning difference between commercial kennels and all other kennel in the Commonwealth is the amount of space required for animals. Commercial kennels must provide twice[4] the amount of floor space for the primary enclosure than all other kennels must provide and an additional space for exercise that is twice as large as the primary enclosure. (*See* Act 119 § 207(i)(1), 207(i)(6)(ii))

The economic impact on the commercial kennel industry is significant. University of Cornell Agricultural Economist Wayne A. Knoblauch, Ph.D states that the economic impact of Act 119 "will destroy the economic viability of the Pennsylvania commercial dog breeding industry." (Report of Dr. Wayne A. Knoblauch attached as Ex. I to Pls.' Mot. Summ. J.)

---

[4] In addition to the baseline doubling of the floor space the second dog added to the enclosure again doubles the amount of space and the 3rd through sixth dog increases the space by 1.5 each. This amount is then doubled for the space required for exercise. So the real increased space is over 5 times greater than kennels that are not defined as commercial kennels.

### *Shutting Down Kennels*

A kennel owner whose license the Department has failed to renew must immediately cease and desist from operating a kennel, buying and selling dogs, offering dogs for sale or in any way transferring dogs. (*See* Act 119 § 211(c))  Such an owner also may not increase the number of dogs through breeding. (*See id.*)  Any kennel subject to these restrictions will obviously suffer severe economic hardship as no money can be made from the sale of puppies in the kennel and all puppies in the kennel will age, decreasing in value, while awaiting disposition of the Department's refusal to renew the license. (Decl. Myer ¶ 8 attached as Ex. F to Pls. Mot. Summ. J.)  These aging puppies will eventually become worthless, denying the kennel owner any economically beneficial use of the dogs, destroying the cash flow stream and likely ending the business. (*See id.*)

Any dogs bred after the cease and desist order that then give birth cause the kennel owner to be in violation of the law and subject the owner to significant fines and criminal penalties.  A prudent kennel owner will need to stop breeding all dogs during the appeal causing the kennel to lose future puppies and destroying the

economic benefit the owner has in the dogs.  (Decl. Myer ¶ 9)

PDA recognizes puppies will continue to be born to dogs bred prior to the cease and desist order.  As these puppies age they will overcrowd pens causing an additional violation from which a kennel owner has no recourse as he cannot sell dogs to make room for the aging puppies.  Adding insult to injury, a kennel must incur significant costs in housing and feeding dogs and puppies while sustaining no income during the course of appealing the desist order.  (Decl. Myer ¶ 9)  There is no way, other than leaving the business, for the kennel owner to avoid such business-ruining costs.  (*See id.*)

### *2009 Renewal Form*

In November 2008, the PDA mailed lengthy license renewal forms to all kennels in Pennsylvania.  (*See* Application attached as Ex. B to Pls.' Mot. Summ. J.)  The form was shortly revised and placed on the PDA's web site where it remains to this day.[5]  (*See* 2009 Application attached as Ex. K to Pls.' Mot. Summ. J.)  Among other things, this renewal license form required all applicants to provide their social security numbers, *see id.* p. 2, and to disclose

---

[5] See http://www.agriculture.state.pa.us/agriculture/lib/agriculture/doglawfiles/kennel_license_application.pdf

all out-of-state dealers with whom the applicant is "currently dealing" and demanding an admission that the applicant "will immediately stop dealing with such unlicensed out-of-state dealer" until the dealer pays the out-of-state premium and obtains a license from the PDA. (*See id.* p.13)

## **STANDARD OF REVIEW**

Summary judgment is appropriate when it appears that "there is no genuine issue as to any material fact and that [the party] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c); *Haugh v. Allstate ins. Co.*, 322 F.3d 227, 231 (3rd Cir. 2003). The court must view the inferences to be drawn from the underlying facts in the light most favorable the nonmoving party. *See Meritcare, Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 223 (3d Cir. 1999).

Each challenge raised by plaintiffs has its own discrete standard plaintiffs have met. To prevail on a facial commerce clause challenge one must establish that the State discriminates against similarly situated entities by drawing geographical distinctions between the two without a compelling interest. *GMC v. Tracy*, 519 U.S. 278, 307 n15 (1997). Success on a facial

unconstitutional takings challenge must establish that the owner is denied economically viable use of his property. *Lucas v. S.C. Costal Council*, 505 U.S. 1003, 1016 (1992). When fundamental rights are at stake, such as the fourth and fifth amendment rights at issue here, a facial equal protection or due process challenge must show that the classifications made by the Commonwealth are not "precisely tailored to serve a compelling governmental interest." *Plyer v. Doe*, 457 U.S. 202, 217 (1982).

## ARGUMENT

Act 119 of 2008, deprives plaintiffs of rights, privileges, or immunities secured by the Constitution and laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981). *Afran v. McGreevey*, 115 Fed. Appx. 539, 543 (3rd Cir. 2004). The Act on its face discriminates against out-of-state residents who desire to sell to any individual who maintains a kennel in the Commonwealth of Pennsylvania.

In addition to facially discriminating against out-of-state residents, the Act: (1) provides for the entry into the home without probable cause other than a kennel owner's refusal to permit inspection of his/her kennel; (2) fails to provide compensation for

the taking of property; and, (3) creates an utter and complete disparity between the regulation of commercial kennels and all other dog owners in the Commonwealth without rational basis, let alone any compelling interest for such a distinction if the purpose of the Act is truly health, welfare and safety of dogs.

Federal law requires that should a government entity request a citizen's social security number, the government must follow a clearly process in order to do so.   PDA refuses to comply with federal law and continues to attempt to collect social security numbers of all applicants for kennel licenses in violation of the Federal Privacy Act.

## I.      Act 119's Requirement That Out-of-State Residents Pay $300 More For A Dealer License is A Per Se Violation of the Commerce Clause

The Commerce Clause vests in Congress the power "[t]o regulate commerce . . . among the several states." U.S. Const., Art. I., §8, cl.3.   Although the Commerce Clause speaks only of Congress's power, it has long been understood that there is a dormant or negative aspect of the Commerce Clause that limits the power of the states to regulate commerce.  This limitation restricts the power of a state either to discriminate against or burden

interstate commerce.  It operates to prohibit states from impeding commerce even inadvertently.  *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 350 (1977) ("We conclude that the challenged [North Carolina] statute cannot stand insofar as it prohibits the display of Washington State grades [of apples] even if enacted for the declared purpose of protecting consumers from deception and fraud in the marketplace.")  The Commerce Clause "prohibits economic protectionism – that is regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996).  The Dormant Commerce Clause absolutely prohibits a state from regulating wholly extraterritorial commerce.  *See BMW of North America Inc. v. Gore*, 517 U.S. 559, 571 (1996) (holding that "no single State" can "impose its own policy choice on neighboring States.")

An out-of-state dealer is defined as "A person who does not reside in the Commonwealth of Pennsylvania . . ." (Act 119 § 102, Ex. A p.5)  Accordingly, an individual who resides in Pennsylvania and owns a pet shop or kennel in another state does not have to purchase a more expensive out-of-state dealer license.  This

Pennsylvania resident avoids the premium charged to out-of-state dealers while engaging in exactly the same enterprise.

"State laws discriminating against interstate commerce on their face are 'virtually per se invalid.'" *Faulkner*, 516 U.S. at 331 (quoting *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 99 (1994)). Section 209 provides: "All out-of-state dealers shall on or before January 1 of each year, apply to the secretary for an out-of-state dealer license. The fee for such license shall be $300, plus appropriate kennel license fees required under section 206." Years ago Justice Cardozo clearly explained what should be the proper result of any fee differentiation between in-state and out-of-state interests:

> "when the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed."

*Henneford v. Silas Mason Co., 300 U.S. 577, 584 (1937).* When the reckoning is closed here, out-of-state dealers pay more money than in-state dealers for a Kennel License, clearly violating the Commerce Clause. Section 209 must be permanently enjoined in

its unequal fee treatment of out-of-state dealers and all money charged in excess of in-state fees must be returned to out-of-state dealers.

## II.   Act 119 Violates the Privileges and Immunities Clause

Article IV, § 2, of the Constitution provides that the "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." This Clause was intended to "fuse into one Nation a collection of independent, sovereign States." *Toomer v. Witsell, 334 U.S. 385, 395 (1948).*   The Privileges and Immunities Clause "was intended to create a national economic union."  *New Hampshire v. Piper*, 470 U.S. 274, 279-80 (1985).  The Supreme Court repeatedly has found that "one of the privileges which the Clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State." *Toomer v. Witsell, supra,* at 396 (holding that nonresident fishermen could not be required to pay a license fee of $ 2,500 for each shrimp boat owned when residents were charged only $ 25 per boat.); *see also*, *Ward v. Maryland, 12 Wall. 418 (1871),* (invalidating a statute under which nonresidents were required to pay $ 300 per year for a license to trade in goods not

manufactured in Maryland, while resident traders paid a fee varying from $ 12 to $ 150.); *Hicklin v. Orbeck, 437 U.S. 518 (1978),* (finding a statute containing a resident hiring preference for all employment related to the development of the State's oil and gas resources a violation of the Privileges and Immunities Clause.)

Out-of-state dog dealers are not competing with their in-state counterparts on substantially equal terms. Mr. Sladkin and Ms. Inserra must pay $300 extra for a kennel license because of the mere fact of their residency in the State of New Jersey. Just as in *Ward, supra*, they are subjected to license fees to conduct business in Pennsylvania that are significantly higher than those of their in-state counterparts. A commercial kennel class I license costs $75 for a Pennsylvania resident; it costs an out-of-state resident 4 times as much - $375. Engaging in commerce is a protected right of  Mr. Sladkin and Ms. Inserra and all other out-of-state dealers.

In a case originating in Pennsylvania long ago in 1825, Justice Bushrod Washington stated the following summary of the fundamental rights protected by the Privileges and Immunities Clause, still relied upon today:

> The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal. . . .

*Corfield v. Coryell*, 6 F. Cas. 546, 552 (No. 3,230) (CCED Pa. 1825). Non-residents that desire to pass through Pennsylvania for the purpose of buying and selling dogs suffer a depravation of their fundamental right to do so under the Privileges and Immunities Clause.

In order to justify discrimination against nonresidents, a state must establish "(i) there is a <u>substantial</u> reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a <u>substantial</u> relationship to the State's objective." *Piper.* 470 U.S. at 284 (emphasis added).  In conducting an analysis of the state's actions, the court must consider whether less restrictive means could be used to accomplish the same substantial reason for the discrimination.  *See id.*

Act 119 provides absolutely no reason for the difference in treatment between out-of-state residents and in state residents. Defendant has no legitimate state objective for the different

treatment of out-of-state dealers either.   Neither Mr. Sladkin nor Ms. Inserra has ever been inspected by an agent of the PDA, has ever been contacted by an agent of the PDA regarding their enterprise or has ever had a review of records conducted.   If anything, out-of-state dealers pose far less administrative and inspection burdens upon the Commonwealth than do in-state dealers.  This lack of any additional administrative burden exposes the bald intent of the Commonwealth as merely one to raise additional revenue for the restricted dog fund.   (*See* Act 119 § 209(a)))

Absent a legitimate state objective, the Commonwealth cannot make out any relationship, let alone a substantial one, between the reason for the disparity in treatment and the state objective. Finally, even if the Commonwealth could conjure up a legitimate state objective, it cannot establish that the means used to accomplish the purpose, of charging out-of-state dealers a premium fee, are the least restrictive.  The license fee disparity expressed in § 209 between out-of-state residents and in-state residents violates the constitution and must be enjoined.   Furthermore, the court should order the Commonwealth to reimburse all out-of-state fees

in excess of in-state-fees that it has been charging to out-of-state residents as such conduct violates both the Commerce Clause and the Privileges and Immunities Clause of the Constitution. *See e.g. Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996)

### III. Act 119's Provisions for Limitless Warrantless Searches of Homes and Businesses Violate the Fourth Amendment of the United States Constitution

The "'overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State.'" *Winston v. Lee*, 470 U.S. 753, 760 (1985) (quoting *Schmerber v. California*, 384 U.S. 757, 767 (1966)).  The Fourth Amendment requires a warrant for searches unless they fall under a few specific exceptions.  This requirement for a warrant "protects commercial buildings as well as private homes." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 310 (1978).  One of the exceptions to the warrant requirement involves "pervasively regulated industries" for which a "substantial" state interest may sometimes justify warrantless searches; however, statutes authorizing such warrantless searches must provide a "constitutionally adequate substitute for a warrant," in the form of strict limits on the time,

place, and scope of the warrantless commercial searches. *New York v. Burger*, 482 U.S. 691, 693, 702-03 (1987).

In the present case, Act 119 has created unreasonable "warrantless search" requirements for kennel owners that clearly violate the Fourth Amendment. First, kennels, including commercial kennels, do not meet the very specific requirements for "pervasively regulated industries." Second, even if the kennels were such "pervasively regulated industries" (which they are not), the terms of Act 119 utterly fail to limit the time, place, and scope of kennel searches, and therefore fail to fulfill the narrow administrative warrantless search exception to the Fourth Amendment. Third, in its most serious and troubling violation of the Fourth Amendment, Act 119 on its face and as interpreted by the PDA purports to allow untrammeled warrantless searches of kennel owners' homes as well as their commercial buildings. Even in the context of administrative warrantless searches, the courts have accorded great protection to citizens' homes and Act 119's provisions for warrantless searches of homes clearly offend the Fourth Amendment.

Act 119 creates a system for circumventing constitutional rights wherein PDA inspectors can obtain sham "warrants" to inspect kennels by ignoring the normal requirement of probable cause. Thus, after stating that PDA has a general and unlimited authority to inspect licensed kennels, the Act provides, concerning search warrants, as follows:

> Search warrant. State dog wardens and other employees of the department may apply for a search warrant to any court of competent jurisdiction . . . for the purposes of inspecting or examining any kennel . . . . The warrant shall be issued upon probable cause. It shall be sufficient probable cause to show any of the following:
>
> (1) that, in cases involving kennels other than private kennels,[6] the state dog warden or an employee of the department has been refused entry as defined under Section 220(A) for an inspection or examination of the kennel.

In turn, Section 220(A) provides:

> Refusal of entry. (a) Violation.—It shall be a violation of this act if a kennel refuses entry to an agent of the Commonwealth acting to enforce this act. The term "refusal of entry" shall include any of the following:
>
> (1) Preventing an agent from entering the **establishment** . . . .
>
> (4) An act or omission that prevents an agent from gaining entry to the **establishment**.
>
> (Emphasis added.)

---

[6] A "private kennel" is any kennel that is not a commercial kennel, once again highlighting the discriminatory treatment targeted at the commercial kennel industry. (*See* Act 119 § 102)

Act 119 newly defines "establishment" as:

> (1) The premises on, in or through which a dog is kept, bred, harbored, boarded, sheltered, maintained, sold, given away, exchanged or in any way transferred.
>
> (2) The term shall encompass all of the following on, in or through which any of the activities under paragraph (1) take place:
>
>> (i) The **home**, **homestead**, place of business or operation . . . . which includes all of the land, property, housing facilities, or any combination of land, property or housing facilities of the individual or person.
>>
>> (ii) All of the persons residing in or on the establishment.

(Emphasis added.)

Thus, Section 218 in conjunction with Section 220 and the definition of "establishment" purports to create a regime in which, if the "home" of a kennel owner contains the family's pet dog, PDA agents are authorized to conduct a warrantless search of the entire home as well as physical searches of all persons residing in the home. The normal requirement of "probable cause" for a search warrant is completely eviscerated. If a kennel owner exercises his or her Fourth Amendment right to refuse a warrantless search, the refusal in itself is defined as probable cause to support issuance of a warrant. Moreover, Section 220 makes the exercise of Fourth

Amendment rights in refusing a search, itself a violation subject to punishment.

Further, the terms of Section 218 place no restrictions on the time, place, or scope of warrantless searches.  Section 218 states that inspections shall occur "at least twice per calendar year" but it places no ceiling on the number of inspections, no limitation on the time of day, and, far from limiting items or places to be searched, Act 119 purports to authorize a totally uncontrolled and unlimited search of homes and all their residents.[7]

### A.   Kennels do not meet the very specific requirements for pervasively regulated industries

To   examine   how   Section   218's   warrantless   search requirements violate the Fourth Amendment rights of plaintiffs, the court must first determine whether commercial kennels are a "pervasively regulated industry" within the meaning of *New York v. Burger*, 482 U.S. 691, 701 (*citing United States v. Biswell*, 406 U.S.

---

[7]  Another provision concerning searches in Section 901 apparently is intended to broaden the PDA's search authority far beyond kennel owners and their families.  That Section provides:  "State dog wardens and employees of the department are hereby authorized to enter upon the premises of any person for the purpose of investigation." "Person" apparently includes anyone present in the Commonwealth, going far beyond persons related in any way to kennels.  In addition, Section 901 states:  "A dog warden or employee of the department may enter into a home or other building only with permission of the occupant or with a duly authorized search warrant."  Apparently this provision is meant to observe the constitutional rights of all the "persons" unrelated to kennels whose premises Section 901 grants authority to search.  However, Section 901 cannot be construed as granting any meaningful rights to kennel owners and their families, since, as we have seen, Section 218 eviscerates the "probable cause" requirement for a warrant by making the kennel owner's refusal of entry equivalent to "probable cause."

311, 316 (1972)).  If commercial kennels are not such an industry, then Act 119's warrantless search requirements must fail on that basis alone.

The categories of businesses that have been found by the Supreme Court to be pervasively regulated industries include liquor dealers, *Colonnade Corp. v. United States*, 397 U.S. 72 (1970); pawnshops licensed to sell firearms, *United States v. Biswell*, 406 U.S. 311 (1972); commercial stone quarries subject to the Federal Mine Safety and Health Act, *Donovan v. Dewey*, 452 U.S. 594 (1980); and junkyards that could be used as "chop shops" by auto thieves, *New York v. Burger*, 482 U.S. 691 (1987). The Supreme Court's "pervasively regulated industries" cases have emphasized that both the degree of government regulation and also its duration are key factors in determining the validity of warrantless search procedures.  *See Burger*, 482 U.S. at 700-701 (reviewing cases and concluding that the "'duration of a particular regulatory scheme'" is an "'important factor' in deciding whether a warrantless inspection pursuant to the scheme is permissible.")  Moreover, there must be a "substantial" government interest in pursuing the warrantless

search scheme, *Burger*, 482 U.S. at 702, such as prevention of serious felonies and violent crime (e.g., *Burger* and *Biswell*).

However, the Supreme Court has made clear that "the closely regulated industry . . . is the exception," and has specifically rejected the argument that all businesses engaged in interstate commerce could be subjected to warrantless searches. *Barlow's*, 436 U.S. at 313-14. Thus, the Court of Appeals for the Sixth Circuit has held that commercial beekeeping is not a pervasively regulated industry, despite a requirement that all apiaries register with the State of Ohio and despite the state's program for detecting and eradicating bee diseases. *Allinder v. Ohio*, 808 F.2d 1180, 1187 (6th Cir. 1987). Likewise, a very small family-owned decorative rock quarry, whose only workers were the husband and wife owners, was found not to be a pervasively regulated business. *Marshall v. Wait*, 628 F.2d 1255, 1259 (9th Cir. 1980). Indeed, *even medical clinics* have been found not to be closely regulated industries, despite state interests in assuring the quality of health services. *Tucson Women's Clinic v. Eden*, 379 F.3d 531, 550-51 (9th Cir. 2004).

In the present case, the commercial kennels operated by plaintiffs do not fall within the definition of a "pervasively regulated"

industry."  Indeed, prior to the adoption of Act 119 in October 2008, the PDA's regulation of kennels consisted of a licensing requirement and relatively few stated standards for ventilation, lighting, and dog housing.   In this respect, the status of commercial kennels in Pennsylvania was similar to that of the apiaries held not to be a "closely regulated industry" in *Allinder, supra*

PDA recognizes this fact in its March 1, 2009, report to the Pennsylvania General Assembly.  (*See* Ex. J to Pls.' Mot. Summ. J.) "The effort to improve dog law enforcement started in late 2006 . . . and progressed from 2007 through the Fall of 2008."  (*Id.* at 1)  The "most significant" change to the regulation of the commercial kennel industry "was the 2008 passage of Act 119, an overhaul of the Pennsylvania Dog Law that raised the bar for commercial kennel owners, and transformed this law into the most progressive in the nation."  (*Id.*)  Moreover, since the duration of regulation is a key factor in the Supreme Court's application of the closely regulated industry standard, PDA cannot bootstrap its way out of its Fourth Amendment violation by claiming that the vastly expanded requirements of Act 119 can convert commercial kennels into pervasively regulated businesses.  Thus, it must be concluded

that commercial kennels cannot be classified as a "pervasively regulated industry" and therefore do not fall within the administrative exception from the Fourth Amendment's normal requirements of search warrants.

### B.   Act 119 fails to fulfill the narrow administrative warrantless search exception to the Fourth Amendment.

Further, even if commercial kennels could be considered a "pervasively regulated industry" (which in fact they are not), the warrantless search scheme set out in Section 218 of Act 119 plainly does not meet the Supreme Court's requirement of a "constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 702-03. This "substitute for a warrant" must consist of very specific limits on the time, place, and scope of warrantless searches. *Id.* For example, in *Burger*, inspections of auto junkyards were confined to regular business hours, were limited to vehicle-dismantling operations, and the scope of inspections included only records, vehicles, and parts of vehicles. *Id.* at 711. In stark contrast, Act 119 contains virtually no limits on PDA's searches of kennels. Above a minimum of two inspections per year, PDA can conduct as many searches as it wants of a particular

kennel.  The searches can be done on any day and at any time.  Far from limiting the places subject to search, Act 119 deliberately expands the search locations to potentially include kennel owners' homes.   In sum, even if kennels were a "pervasively regulated industry" (which they are not), the Act 119 search requirements could not possibly meet the Supreme Court's requirement of a "constitutionally adequate substitute for a warrant" in the form of specific time, place, and scope restrictions.

### C.   *Act 119 allowance for warrantless searches of business, homes and persons is unconstitutional.*

Finally, even in a commercial search context, the courts accord a special status and heightened protection to citizens' homes.   For example, the horseracing industry has long been considered a pervasively regulated industry subject to administrative warrantless searches.  *Shoemaker v. Handel*, 795 F.2d 1136 (3rd Cir. 1986).   However, the Court of Appeals for the Second Circuit has held that, even in the highly regulated context of horseracing, warrantless searches of dormitory rooms at a racetrack were equivalent to searches of homes and therefore violated the Fourth Amendment.  *Anobile v. Pelligrino*, 303 F.3d

107, 120-21 (2nd Cir. 2001).  In another case regarding the potential administrative searches of homes engaged in home schooling of the family's children, the same Court observed that "a challenge to [warrantless administrative home] visits by persons subjected to them would present at least a colorable legal issue," and thus declined to rule that the issue was moot.  *Blackwelder v. Safnauer*, 866 F.2d 548, 551-52 (2nd Cir. 1989).

In this context, Act 119's blatant attempt to extend commercial searches into the privacy of the home could not be a more obvious violation of the Fourth Amendment.  Sections 218 and 901(a) of Act 119 of 2008 violate the Fourth Amendment to the United States Constitution.

## IV.    The Arbitrary and Unreasonable Restrictions Placed on Commercial Kennels by Act 119 Violate the Equal Protection Clause of the Fourteenth Amendment.

The Equal Protection Clause of the Fourteenth Amendment prohibits any State from denying "to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Where, as in the present case, a state statute violates fundamental rights, a claim of violation of equal protection is subject to strict scrutiny, *i.e.*, the classifications made by the State

must be "precisely tailored to serve a compelling governmental interest." *Plyler v. Doe*, 457 U.S. 202, 217 (1982).   These fundamental rights include all rights which have their source, either explicitly or implicitly, in the Constitution.   *Id.* at 217 n.15 State laws which violate such constitutional rights are thus held to the strict-scrutiny standard, as distinguished from the "rational basis" test of whether the state law's classifications are "rationally related to a legitimate governmental purpose," which applies to most social or economic legislation.   *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446 (1985).

To establish an equal protection claim, plaintiffs must demonstrate that they are being subjected to different treatment from that received by others who are similarly situated.   *Shuman v. Penn Manor School Dist.*, 422 F.3d 141, 151 (3rd Cir. 2005).   In the present case, Act 119 creates far more onerous restrictions on plaintiffs' commercial kennels than on all other kennels located in the Commonwealth.   Indeed, the restrictions on commercial kennels are so onerous and completely unreasonable that their businesses cannot possibly survive if subjected to Act 119.   (*See* Economic Impact Report of Wayne A. Knoblauch, Ph.D., pp. 2, 4.)

Section 1 of Act 119 defines eight categories of kennels, including "boarding kennel," "commercial kennel," "dealer kennel," "non-profit kennel," "pet shop-kennel," "private kennel," "rescue network kennel," and "research kennel."   Under Section 206 of the Act, dealer kennels, pet shop-kennels, private kennels, rescue network kennels, and research kennels are all subdivided into six kennel "classes" based on capacity ranging from up to 50 dogs to more than 500 dogs, with licensing fees ranging from $75 to $750 per year.   Likewise, commercial kennels are subdivided into the same six kennel "classes" with the same fees.   Boarding kennels are charged varying license fees of $100 to $250 per year based on the number of dogs they can accommodate.   Non-profit kennels are charged a flat $25 per year fee and the Act places no limit on the number of dogs that can be housed at a non-profit kennel.

But for the term "commercial," plaintiffs are classified by Act 119 in the exact same manner as dealer, pet shop, private, rescue network, and research kennels and are clearly similarly situated to these kennels.  Plaintiffs are similarly situated to the boarding and non-profit kennels as well, insofar as there are no absolute size

limits on those types of kennels and no limits on the types, sex, or age of dogs which may be housed in them.

Yet, Act 119 targets and singles out commercial kennels for treatment and scrutiny far different from all other kennels.  After setting forth some general requirements as to, *e.g.*, licensing, record keeping, and exercise plans, the law then promulgates pages of additional requirements <u>solely</u> for commercial kennels.  (Act 199, §§ 207(h), 207(i))  The additional requirements for commercial kennels are irrational and unjustified disparate treatment, given that any of the other types of kennels may house as many dogs under similar circumstances to those of the commercial kennels.   Yet only commercial kennels must:

a. Satisfy a 12-point requirement for primary enclosures;

b. Provide detailed amounts of additional floor space for each nursing dog;

c. Conform to strict housing requirements for dogs based on compatibility and temperament;

d. Maintain a highly detailed written program of veterinary care;

e. Comply with heating and cooling requirements, including temperature limits, for housing facilities;

f. Comply with detailed ventilation and humidity requirements for housing facilities;

g. Comply with lighting requirements, including protection from "excessive light," for housing facilities;

h. Comply with moisture-resistance requirements for housing facilities;

i. Follow detailed directives on cleaning of primary enclosures;

j. Abstain from stacking primary enclosures when dogs are less than 12 weeks old to more than two rows high and limit the height of the uppermost primary enclosure;

k. Provide for smoke alarms *and* fire extinguishers or sprinkler systems;

l. Provide for daily or more frequent removal of various forms of dirt;

m. Comply with detailed cleaning requirements for primary enclosures;

n. Follow prescribed methods of sanitation of primary enclosures and food and water receptacles;

o. Conform  surrounding grounds and buildings to various guidelines, including standards for grass and bushes;

p. Institute a program for control of insects;

q. *Permanently* retain records;

r. Maintain veterinary records for dogs no longer at the kennel;

s. Seek the intervention of a veterinarian in order to euthanize any dog;

t. Refrain from stacking primary enclosures for dogs older than 12 weeks of age;

u. Provide floor space for dogs over 12 weeks of age that is *double* the floor space required of other kennels, namely, the length of the dog in inches plus six, times the length of the dog in inches plus six, measuring the dog from the tip of its nose to the base of its tail.  This amount is divided by 144 and *multiplied by 2* to calculate the required floor space in square feet.  For any second dog placed in the primary enclosure the floor space must be

doubled using the longest dog calculation. For each dog above two dogs, the minimum floor space must be multiplied by 1.5 per additional dog;

v. Provide a specific type of flooring in primary enclosures;

w. Follow guidelines for dogs' entryways from exercise areas into primary enclosures;

x. Establish detailed exercise requirements for dogs equal to double the space calculated by paragraph u. above and equating to up to 40 times more space required than a similarly situated private kennel;

y. Provide for outdoor exercise for dogs;

z. Follow directives on administration of rabies vaccination;

aa.   Have dogs examined by a veterinarian once every six months.

(Act 119, §§ 207(h) and 207(i))  Each of the 27 subjects of special requirements listed above unfairly targets commercial kennels and fails to be precisely tailored to any compelling interest (or indeed, fails even to be rationally related to any legitimate purpose) of the Commonwealth.   Three specific examples of these irrational requirements will demonstrate the grossly unfair and unequal

treatment of commercial kennels under Act 119: (1) requirements of floor space per dog; (2) the requirement that euthanasia may *only* be done by a veterinarian; and (3) requirements for ventilation.

Under the regulations governing kennels in effect prior to the adoption of Act 119, all kennels – not just commercial kennels – are to house each dog in a primary enclosure with a minimum floor space requirement. This requirement, set forth in 7 Pa. Code § 21.23(b), calculates the floor space by taking the square of the length of the dog in inches plus 6, then dividing that number by 144 to yield the required floor space in square feet. By comparison, the new requirement applicable *only* to commercial kennels in Act 119, § 207(i)(1), sets forth a calculation similar to that in 7 Pa. Code § 21.23(b), but then requires *multiplying the resulting square feet by 2*; in other words, Act 119 forces commercial kennels to provide twice as much floor space per dog as any other type of kennel. In addition, Act 119 requires that, for placement of a second dog in a primary enclosure, a commercial kennel must *double* the amount of floor space required for a single dog; and, for each dog above two, multiply floor space by 1.5 per additional dog up to a maximum of six dogs. Then, only commercial kennels must provide double this

amount of space for unfettered outdoor exercise.  (*See* Act 119 §
207(i))

Thus, if we assume that a certain size dog in any other type of
kennel would be required to have 5 square feet of floor space, Act
119 would automatically require a commercial kennel to provide *10
square feet* of floor space for the *same size dog*.  If a second dog of
similar size was added to the primary enclosure in any other type of
kennel, the two dogs would require *10 square feet*.  But under Act
119, in the commercial kennel, the two dogs would require *20
square feet*.  If a third dog were added, the other kennel would have
to provide *15 square feet for 3 dogs*; but the commercial kennel,
under Act 119, would have to provide *27.5 square feet for 3 dogs*.  If
the commercial kennel has the maximum number of dogs allowed,
the commercial kennel must provide 50 square feet for six dogs and
private kennels could provide only 30 square feet of space.  And yet,
there is more.  The commercial kennel, and the commercial kennel
only, must then double the space requirement to 100 square feet
and provide this amount of space <u>in addition</u> as exercise area for a
total requirement of 150 square feet of space compared to a private
kennel's requirement of 30 square feet, five times less than

commercial kennels.    As noted in plaintiffs' expert's Economic Impact Report, the increase in pen size required by Act 119 will reduce the number of dogs that can be housed in a facility (*id.*, p. 1.), and this will contribute significantly to destroying the economic viability of all commercial kennels.  In contrast, for all other types of kennels, floor space requirements are not affected by Act 119, and they will incur no diminution of the number of dogs that can be housed in their facilities.

Act 119 also singles out commercial kennels as the only kennels subject to a requirement that "a dog may not be euthanized except by a veterinarian."  (Act 119, § 207(h)(17).)  This requirement is especially indicative of the irrational nature of the constraints Act 119 places only upon commercial kennels.    Presumably the Commonwealth's purpose in enacting Act 119 is to safeguard "the health, safety and welfare" of dogs.[8]    Certainly unfortunate circumstances can arise when an animal may suffer a severe accidental injury and there can be a delay of hours in being able to obtain the services of a veterinarian.  In such circumstances, Act

---

[8] *See* Act 119, § 211(a)(5), permitting revocation or refusal of a kennel license if granting the license "would jeopardize the health, safety and welfare of the dogs;" see also § 211(a.1)(3), listing "effect of the violation on the health or welfare of a dog" as a factor to consider in the revocation or refusal of a kennel license.

119 wisely does not limit the ability of owners of all types of kennels – except commercial kennels – to use their best judgment in euthanizing a suffering animal promptly, out of consideration for its welfare.   Thus, Act 119's absolute prohibition against commercial kennels ever having any animals euthanized except by a veterinarian, actually defeats Act 119's presumed purpose of furthering the welfare of dogs.

Lastly, Act 119, § 207(h)(7) sets general requirements for ventilation and humidity levels in commercial kennels, and directs that a Canine Health Board, newly established under Act 119, § 221, is empowered to set more specific standards for ventilation. On January 17, 2009, the newly appointed Canine Health Board issued "Temporary Guidelines Standards for Commercial Kennels," covering ventilation, lighting, and flooring.   (Ex. E pp 3-6 to Pls.' Mot. Summ. J.)  As to ventilation, the Temporary Guidelines require mechanical ventilation, heating, and cooling systems for all commercial kennels.  Temperatures must be kept below 86 degrees Fahrenheit.  When the temperature is in the range of 50-75 degrees F, relative humidity must be in the range of 40-60%.  When the temperature is above 75 degrees F, relative humidity must be 1-

50%.   Ammonia levels must be less than 10 parts per million. Commercial kennels must have carbon monoxide detectors. Commercial kennels must have operable windows, doors, or skylights in case of mechanical system malfunction and must take steps to correct the malfunction immediately.   Particulate matter shall be below 10 milligrams per cubic meter.   The commercial kennel must provide between 8-20 air changes of 100% fresh air per hour.

In contrast, the existing regulations applying to all kennels other than commercial kennels require only that housing shall be "sufficiently ventilated . . . to minimize drafts, odors, ammonia levels and moisture condensation."   Mechanical ventilation or air conditioning generally is not required; however, when temperatures are 85 degrees F or higher, a fan, blower, *or* air conditioner shall be provided.   Relative humidity "shall be maintained at a level that ensures the health and well-being of the dog housed therein."   (7 Pa. Code § 21.26.)

Obviously, all other similarly situated kennels are subject only to very general standards of ventilation, while commercial kennels are now required, under Act 119 and the Temporary Guidelines

promulgated thereunder, to install very costly automatic heating, ventilation, and air conditioning systems.   Plaintiffs' expert Dr. Knoblauch has noted in his Economic Impact Report that "providing air conditioning with rapid air exchanges" is one of the Act 119 standards that will "require large capital costs" resulting in the inability of *any* Pennsylvania commercial kennels to survive. (*Id.*, pp. 1-2.)   If these onerous ventilation standards were truly necessary for the welfare of dogs, why does Act 119 leave all other types of kennels unaffected by them?   Indeed, the unreasonable nature of the ventilation standards is clear from the fact that many human habitations do not meet such standards.

In addition to the violation of plaintiffs' right to equal protection, the Commonwealth's adoption and implementation of Act 119 violates other fundamental constitutional rights of the commercial kennel owners.   In particular:   (1) Act 119 violates commercial kennel owners' right, assured by the Commerce Clause and Privileges and Immunities Clause, to engage in transactions with out-of-state dealers; (2) Act 119 violates commercial kennel owners' right to be free of unreasonable searches, as guaranteed by the Fourth Amendment; (3) Act 119 violates commercial kennel

owners' right to due process of law, guaranteed by the Fourteenth Amendment; and (4) Act 119 violates the commercial kennel owners' right to be free from takings of their property without just compensation, as guaranteed by the Fifth and Fourteenth Amendments.

State laws are subject to a strict-scrutiny equal protection analysis whenever they "impinge on personal rights protected by the Constitution." *City of Cleburne v. Cleburne Living Center, Inc*, 473 U.S. at 440 (*citing Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621 (1969); *Shapiro v. Thompson*, 394 U.S. 618 (1969); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942)). These fundamental rights include the right of interstate travel, the right to vote, rights guaranteed by the First Amendment, and the right to procreate. *United States v. Williams*, 124 F.3d 411, 422 (3rd Cir. 1997). As the Supreme Court described such fundamental rights in *Plyler v. Doe*, 457 U.S. at 217 n.15, they would include all enumerated and implied rights grounded in the Constitution, but may also include rights that are not constitutionally protected, such as the right to vote. In the present case, all the constitutional rights of commercial kennel owners that are violated by Act 119 are

enumerated constitutional rights; therefore, there is no doubt that they are "fundamental rights" which subject the commercial kennel owners' equal protection claim to strict scrutiny.

Under strict scrutiny analysis, a classification creating dissimilar treatment for similarly situated groups must be "precisely tailored to serve a compelling governmental interest." *Plyler*, 457 U.S. at 217  Thus, if the governmental interest is not "compelling," the classification will violate equal protection.  And even if there may be a compelling interest, the statute will still be struck down if it is not "precisely tailored" to serve the interest.  Here, the Commonwealth's interest in enacting Act 119 is to further the health and welfare of dogs.  While that may be a proper subject of legislation and even a laudable goal, it does not rise to the level of a compelling state interest.  Compelling state interests include such matters as the state's obligation to provide a full education for children, *Circle School v. Phillips*, 270 F. Supp. 2d 616, 626 (E.D. Pa. 2003), or assuring the safety of citizens, *Lutz v. City of York*, 899 F.2d 255, 269 (3rd Cir. 1990).  Laws relating to animal welfare, such as Act 119, may be proper subjects of governmental interest. However, they simply are not as vital as laws addressed to human

safety and welfare, and therefore cannot be considered to reflect a "compelling" state interest.

Moreover, even if animal welfare were a compelling interest (which it is not), Act 119's differential treatment of commercial kennels certainly is not narrowly tailored to serve animal welfare. For example, the ventilation requirements might usefully be somewhat more specific for very large facilities, but Act 119 and the Temporary Guidelines, rather than adjusting ventilation requirements for kennel size, instead apply only very general requirements to all kennels other than commercial kennels, even if they have hundreds of dogs; while applying the very onerous and detailed standards to all commercial kennels, even those with less than 50 dogs.

Occasionally courts will decline to determine whether fundamental rights subject to strict scrutiny are at stake, when the disparate treatment in question could not survive even the lower threshold of a rational basis test. *See*, *e.g.*, *Doe v. Pennsylvania Board of Probation and Parole*, 513 F.3d 95, 107 (3d Cir. 2008). Under the rational basis test, a statute will not violate equal protection so long as it bears a rational relationship to some

legitimate end.  *Id.*, *citing Romer v. Evans*, 517 U.S. 620, 631 (1996).
Even though rational basis review may accord a presumption of
validity to the challenged statute, it is simply not the case that "the
government always wins" under rational basis review.  *Doe*, *supra*,
at 112 n.9 "A necessary corollary to and implication of rationality as
a test is that there will be situations where proffered reasons are
not rational."  *Id.*  Thus, in *Doe*, the Court of Appeals found that
subjecting *all* out-of-state sex offenders to community notification,
without the procedural safeguards accorded to in-state sex
offenders, was not rationally related to protecting citizens from
violent predators, and therefore violated the out-of-state offender's
right to equal protection.   Similarly, in *West Virginia University
Hospitals, Inc. v. Rendell*, 2007 U.S. Dist. LEXIS 81901 (M.D. Pa.
Nov. 5, 2007), under a rational basis test, the Commonwealth's
failure to pay trauma disproportionate share hospital payments to
an out-of-state hospital was found to have no rational relationship
to – indeed, even to undermine – the Commonwealth's stated goal of
assuring comprehensive trauma care for its citizens.

Thus, in the present case, Act 119's imposition of extremely
harsh standards only on commercial kennels is not rationally

related to any purpose of furthering the health and welfare of dogs. The other types of kennels classified in Act 119 can be just as large as, and may be larger than, commercial kennels and can house dogs of similar sizes, characteristics, breeds, ages, and temperaments as the dogs in commercial kennels.  It is therefore irrational for Act 119 to leave all other kennels comparatively unregulated, while imposing vastly more requirements on commercial kennels.  Indeed, the fact that these overly extensive new requirements will destroy the economic viability of all Pennsylvania commercial kennels, as demonstrated in Dr. Knoblauch's report, suggests that enhancing the welfare of dogs cannot be the actual purpose of Act 119.  Destroying the businesses of all Pennsylvania commercial kennel owners by imposing unbearable costs of regulatory compliance is simply not a legitimate governmental purpose.

No matter what test is applied to plaintiffs' equal protection claim, Act 119 fails the test.  Given that Act 119 violates many of plaintiffs' fundamental constitutional rights, the equal protection claim should be judged by a strict scrutiny standard.  If so, animal welfare is not a "compelling' state interest, and Act 119's differential

treatment of commercial kennels and all other kennels is not narrowly tailored to improve animal welfare.  Moreover, even if Act 119 were to be judged by a more forgiving "rational basis" test, the distinctions it draws between commercial kennels and all others are not rationally related to animal welfare; indeed, the destruction of the economic viability of all commercial kennels is not in any way a legitimate purpose.

## V.    Act 119 Mandates Unconstitutional Taking of Private Property in Violation of the Takings Clause of the Fifth Amendment to the United States Constitution

The Fifth Amendment to the United States Constitution prohibits "private property to be taken for public use without just compensation."  U.S. Const. amend. V.  Commonly referred to as the "Takings Clause" this principle is applicable to state governments through the Fourteenth Amendment.  *Ash v. Redevelopment Auth.*, 143 Fed. Appx. 439, 441 (3d Cir. 2005).  "[T]he Takings Clause 'does not prohibit the taking of private property, but instead places a condition on the exercise of that power."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536, (2005) (Quoting *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U.S. 304, 314 (1987)).  It is well settled

that government <u>regulation</u> of property can amount to a taking requiring just compensation. *Id.* at 537.

Act 119, as amended, provides for the taking of property without any, let alone just, compensation.  While kennels housing seized dogs are assured payment under the Act, *see* § 211(e)(2.1), any kennel owner receiving notice of kennel license revocation or nonrenewal must shut down the business under threat of serious criminal and administrative sanctions.  Section 211(c) provides in pertinent part:

> (c) Administrative process.--
>
>> (1) If the secretary revokes or refuses a kennel license . . . a person whose license revocation or refusal has become effective shall comply with all of the following:
>>
>>> (i)  <u>Immediately cease and desist from operating a kennel</u>, including boarding, buying, exchanging, selling, offering for sale, giving away or in any way transferring dogs. [9]
>>>
>>> (ii)  <u>Acquire no additional dogs nor increase the number of dogs in the kennel by any means, including breeding</u>. This subparagraph does not apply to an acquisition or increase by birth of puppies from a

---

[9] This section was preliminarily enjoined by the court on the parties' joint stipulation.

> mother which, at the time of
> revocation or refusal was:
>
> (A) on the property;
> (B) pregnant; and
> (C) owned by the kennel or the
> kennel owner.
>
> (ii)   Notify the department prior to the
> euthanization of any dog. No dog
> may be euthanized unless it is
> determined by a veterinarian that
> the euthanasia will prevent the dog
> from suffering caused by a medical
> condition. . . .
>
> (iii)   Permit State dog wardens to inspect
> the kennel without a warrant in
> order to determine compliance with
> the department's order, any relevant
> court order and any provision of this
> act.
>
> . . .
>
> (2) The following apply to appeals:
>
> (i)   This paragraph applies to a person
> whose license is refused or revoked
> and who:
>
> (A) has timely filed a request for an
> administrative appeal; and
>
> (B) would continue to require a
> kennel license under this act,
> pending the exhaustion of all
> administrative appeals.

> (ii)   A person subject to subparagraph (i) shall:
>
> (A) be considered to be operating under suspension;
>
> (B) receive notice from the department of the license being suspended; and
>
> (C) **during the duration of all administrative appeals**, **and thereafter** if the department's action is upheld, **be subject to the requirements set forth in paragraph (1)(i), (ii), (iii) and (iv)**.

In *Lingle v. Chevron, supra.*, the Supreme Court described three categories of takings. *Id.* at 538. Each category aims "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Id.* at 539. Two categories constitute *per se* takings. The first of these categories is a physical taking "where [the] government requires an owner to suffer a permanent physical invasion of her property -- however minor...". *Id.* The second category of *per se* taking occurs when a regulation completely deprives an owner of "all economically beneficial use of her property." *Lucas v. South Carolina Coastal*

*Council*, 505 U.S. 1003 (1992).  *Lucas* involved a challenge to a state law that prohibited a landowner from developing any permanent structures on two beach front lots he had purchased.

With respect to personal property, such as an income stream earned from the sale of dogs[10], the same *Lucas*-type constraints apply.  *See Phillips v. Wash. Legal Found.*, 524 U.S. 156, 160 (1998) ("interest earned on client funds held in IOLTA accounts is "private property" of either the client or the attorney for purposes of the Takings Clause of the Fifth Amendment."); *see also Cienega Gardens v. United States*, 503 F.3d 1266, 1279 (Fed. Cir. 2007) (Regulatory taking of income loss may violate Takings Clause of Fifth Amendment).

The Act contemplates that bred dogs will have puppies during the appeals process, but a kennel is not able to earn any money from these puppies.  (*See* Act 119 §211(c)(i)-(ii)).  This recognition demonstrates an obvious catch-22:  additional dogs will be born but cannot be sold.  Puppies will become dogs requiring more space and forcing otherwise compliant kennels into violation of the new space requirements contained in § 207(i).  The Act provides no mechanism

---

[10] "All dogs are hereby declared to be personal property and subjects of theft."  (Act 119 §611)

for appointment of an agent to continue to operate the business and preserve its assets while the appeals are pending and no Departmental oversight that would accomplish a similar result. *See e.g.* 15 Pa.C.S. § 1984 *et seq.* (Providing for the appointment of a receiver during an involuntary business dissolution.)   The only option is to "cease operating" the business.  To add insult to injury, no dogs my be bred and have puppies after the Department commences action against a kennel owner, strangling any cash flow the kennel may have in the future if it is successful on appeal. Section 211(c) is a per se regulatory taking as it takes income from the sale of puppies without any compensation, any provision for compensation or any opportunity for compensation to the kennel owner.

As in *Lucas*, § 211(c)(1)(i) and (ii) completely deprive a kennel owner of "all economically beneficial use of her property."   Puppies are marketable only for a fixed period of time, 8 to 12 weeks.[11]  (*See* Decl. Nathan Myer attached as Ex F to Pls. Mot. Summ. J.)   From 12 to 16 weeks old a dog is worth one-half of what it was previously.   After reaching 17 weeks of age a dog's value plummets

---

[11] The Act too considers a canine to no longer be a puppy after 12 weeks of age.  (Act 119 § 207(i)).

to zero.  (*See id.*)  Moreover, kennels earn the overwhelming amount of their income through the sale of puppies.  Popular breeds of puppies wholesale between $150 and $400 a piece and retail from $250 to $550 a piece.  By directing under threat of criminal punishment that no dogs may be bred and no puppies may be bought or sold, PDA completely deprives an owner of the dogs of any economically beneficial use of her property.

Upon receiving a Notice of License Refusal Order from the Department a kennel is faced with a Faustian Choice – go out of business in 10 days, or appeal and suffer economic devastation. Any kennel pursuing its right to an administrative appeal is not only bound to "immediately cease and desist from operating a kennel" under threat of criminal and administrative sanction but is so bound by the mere exercise of its due process rights.  There is no provision in the Act for any compensation for the regulatory taking effected by the Act, let alone a "just" compensation for the taking.

In addition to *per se* regulatory takings is the third, factors-based approach to governmental takings explained in *Penn Central Transportation Company v. New York City*, 438 U.S. 104 (1978). These factors include:

> the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.  In addition, the character of the governmental action -- for instance whether it amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good -- may be relevant in discerning whether a taking has occurred.

*Lingle*, 544 at 538-39, *citing Penn Central*, 438 U.S. at 124. The process of §211(c) fails this test as well.  The economic impact on kennel owners is devastating – it destroys the business in a way in which it cannot recover.   Section 211(c) is not a mere public program adjusting benefits and burdens of economic life to promote the common good, but kills the economic life of any kennel subject to it.  It is like taking the bureaucratic steps to shut down a store while refusing to allow the store to sell any of its products.

The Act provides that if the Department ever discovers there are reasonable grounds to believe a dog's health, safety or welfare is endangered as a consequence of neglect or depravation of care, the Department may seize the dogs.   (Act 119, §§ 207(a.3)(2) and

211(d)(2)).[12]   However,  the  Department's  power  to  seize  dogs  is completely unconnected to the Department's demand that an owner forfeit his livelihood to exercise due process rights.

Regardless of any finding of harm justifying removal, the Act creates an administrative *per se* taking of plaintiffs' property without any compensation.  Should a kennel have the desire to actually stay in business, it is threatened with criminal and administrative sanction should it make the attempt.  Because Section 211(c)(1)(i) and (ii) violate the Fifth Amendment's prohibition against unjust government takings, § 211(c)(1)(i)'s preliminary injunction must be made permanent and § 211(c)(1)(ii) must be permanently enjoined.

**VI.  Act 119's Provision that the Exercise of Fourth Amendment Rights Subjects A Person to Criminal And Civil Penalties and its Requirement that A Kennel Owner Suffer the Forfeiture of Property in Order to Exercise Procedural Due Process Rights Violates the Due Process Clause of the Fourteenth Amendment**

Act 119 unconstitutionally threatens punishment to any kennel owner who exercises his Fourth Amendment rights and refuses to consent to a search without a warrant.  (*See* Act 119 §

---

[12] Plaintiffs are not challenging the Commonwealth's authority to seize dogs when the dog's health, safety and welfare are in jeopardy through abuse or negligence.

220(A))   The Act also requires a kennel owner to suffer a pre-hearing forfeiture of property in order to exercise her procedural due process right to appeal a cease and desist order.

It would seem axiomatic that that it is fundamentally unfair for a statute to bludgeon a citizen into the search of his or her business, home and person without a warrant under threat that to refuse the search is grounds for civil and criminal charges.  (*See id.*) There would be little need for the Fourth Amendment is this were the case.  *See e.g.  Welsh v. Wis.,* 466 U.S. 740, 748 (1984) ("It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest.")

It has been long recognized that prior to denying someone of a fundamental right, such as the right to property, the Commonwealth must provide, at a minimum, notice and an opportunity to be heard.  *Goss v. Lopez*, 419 U.S. 565, 579 (1975). "The fundamental requisite of due process of law is the opportunity

to be heard," *Grannis v. Ordean*, 234 U.S. 385, 394 (1914), a right that "has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to . . . contest." *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950).

At the outset, a commercial kennel owner receiving a cease and desist letter from the PDA will lose property interests by either exercising his due process right to a hearing or by liquidating his kennel. Tragically, the mere exercise of the due process right, triggers a pre-hearing property loss as all sales and breeding of dogs must in cease. Indeed, at the hearing, there is no mechanism to remedy the property loss as it continues indefinitely after the right to be heard until a final decision is rendered by the Secretary. (*See* Act 119 § 211(c)). The law on its face violates procedural due process.

Not only does the law violate procedural due process, but it is also fundamentally unfair as it fails to provide any time by which a hearing must be granted after the pre-hearing taking of property and punishes a kennel for exercising its appeal rights by taking the kennel's property. Any commercial kennel owner out of favor with

the Department and receiving a pre-hearing cease and desist order

or a final cease and desist order from the Department must halt all

operations.   (Act 119, sec. 207(a.3)).   Despite having the right to

appeal a decision by the Department, the final order effectively runs

the kennel out of business regardless of the outcome of the appeal.

The kennel owner may not buy, sell or exchange any dogs and may

not increase the number of dogs through breeding.

## VII.   The Commonwealth must be enjoined from flaunting the Privacy Act

Page 2 of the 2009 Kennel License Application requires that all

applicants provide a social security number.   (*See* Kennel License

Application for 2009 attached as Ex. K to Pls.' Mot. Summ. J.)   The

Federal Privacy Act was designed to protect citizens against the

improper use of a citizen's social security number by governmental

agencies. Privacy Act of 1974, Pub.L. 93-579, § 7(b), 88 Stat. 1896,

1909 (1974) 5 U.S.C. § 552a note.

The Federal Privacy Act states in pertinent part:

Any Federal ***state or local government agency*** which
requests an individual to disclose his social security
account number shall inform that individual whether
that disclosure is mandatory or voluntary, by what
statutory or other authority such number is solicited,

and what uses will be made of it. Act Dec. 31, 1974, P.L. 93-579, § 7(b), 88 Stat. 1909. (1974)

5 U.S.C. § 552a note (emphasis added).   In order for a state governmental agency, such as the Bureau of Dog Law Enforcement, to demand a citizen's social security number, the agency must first advise the citizen whether the disclosure is mandatory or voluntary and, if mandatory, the statutory authority that requires disclosure and the use to be made of their number.   Moreover, when a constitutional right is at stake, the right cannot be denied because a citizen refuses to provide a social security number.   *See Stollenwerk v. Miller,* No. 04-5510, 2006 U.S. Dist. Lexis 7048 (E.D.Pa. 2006).

The 2009 Kennel License Application is woefully inadequate under the Federal Privacy Act.   Nowhere has the Department informed the applicants whether the disclosure is voluntary or mandatory.   If the Department considers such a disclosure mandatory, it has failed to provide the statutory authority upon which such a demand is grounded; most likely because none exists. Finally, the Department has failed to explain to the applicants the use to be made of their social security number.

Despite being advised of the inadequacy of the Kennel License Application Form, the PDA has steadfastly maintained the requirement on the form posted on its website and attached as Exhibit K.   PDA must be enjoined from the collection of social security numbers in violation of the Federal Privacy Act.

## **CONCLUSION**

For the above stated reasons, plaintiffs' motion for summary judgment should be granted and the court should declare that Section 209 of Act 119 of 2008 violates the Commerce Clause of Article I, § 8, Clause 3 of the United States Constitution and the Privileges and Immunities Clause of Article IV of the United States Constitution by its requirement that out-of-state residents pay an additional $300 for a dealer license; that Sections 218 and 901(a) of Act 119 of 2008 violate the Fourth Amendment to the United States Constitution; that Sections 211(c)(1)(i) and (ii) and § 211(c)(2)(ii)(C) violate the Due Process clause of the Fourteenth Amendment to the United States Constitution and the Takings Clause of the Fifth Amendment to the United States Constitution; and, that Sections 207(h) and 207(i) violate and Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

The court should permanently enjoin Defendant his agents and employees, attorneys, and all persons and entities in active concert or participation with them from enforcing Sections 207(h), 207(k), 211(c)(1)(i) and (ii) and § 211(c)(2)(ii)(C), 209, 218 and 901(a) of Act 119 of 2008 and from demanding social security numbers of plaintiffs and other similarly situated persons in violation of the Federal Privacy Act.

Finally, the court should order defendant to reimburse all fees charged to all out-of-state residents in excess of those charged to in-state residents from 2007 to the present.

Respectfully submitted,

CLYMER & MUSSER, P.C.

Date: April 3, 2009          _s/Leonard G. Brown, III_____
                             LEONARD G. BROWN, III
                             Pennsylvania Bar No. 83207
                             CLYMER & MUSSER, P.C.
                             408 West Chestnut St.
                             Lancaster, PA 17603
                             (717) 299-7101
                             (717) 299-5115—facsimile

# CERTIFICATION OF WORD COUNT

This brief complies with the word-count limit of the court's order of March 4, 2009, in that the actual word count of the numerical page numbers of the brief, excluding the table of contents, table of authorities, certificate of service and this certification, is 12,314.


　　　　　　　　　　　　　__s/*Leonard G. Brown, III*_____
　　　　　　　　　　　　　　　Leonard G. Brown, III, Esq.

Date:  April 3, 2009

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I am this day serving upon all persons listed below a true and correct copy of the foregoing document via the Electronic Case Filing System of the United States District Court for the Middle District of Pennsylvania as follows:

                                 Pennsylvania Office of the Attorney General
                                 Kenneth Joel, Esq.
                                 Strawberry Square
                                 Harrisburg, PA 17120

Date:  April 3, 2009       _/s/ Leonard G. Brown, III_____
                                 LEONARD G. BROWN, III
                                 Pennsylvania Bar No. 83207
                                 CLYMER & MUSSER, P.C.
                                 408 West Chestnut St.
                                 Lancaster, PA 17603
                                 (717) 299-7101
                                 (717) 299-5115—facsimile